# WORKMAN *v.* NEW YORK CITY, MAYOR, ALDERMEN AND COMMONALTY

CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE SECOND CIRCUIT.

No. 1. Argued April 17, 1899. — Decided December 24, 1900.

In June, 1893, the Linda Park was moored to a dock at pier 48, East River, New York City. While there she was struck and injured by the steam fire-boat New Yorker, as it was running into the slip between piers 48 and 49, for the purpose of getting near another fire-boat then in the slip. Both boats had been called to aid in extinguishing a fire in a warehouse near the slip bulkhead. A libel was filed by Workman in the District Court of the United States to recover for the damage occasioned to his vessel

by the collision.   This libel was amended by adding as respondents the
fire department of New York and Gallagher, who was in charge of the navi-
gation of the New Yorker and the necessary allegations were made.    The
District Court entered a decree in favor of the libellant against the city and
Gallagher, and dismissed the libel as to the fire department.    The Circuit
Court of Appeals affirmed the decree against Gallagher and in favor of
the fire department, but reversed that portion which held the city lia-
ble.    The case being brought here on certiorari, it is *held* that the Dis-
trict Court rightly decided that the mayor, aldermen and commonalty
of the city of New York were liable for the damages sustained by the
owner of the Linda Park.

Where both courts below have concurred in a finding of fact, it will, in this
court, be accepted as conclusive, unless it affirmatively appears that the
lower courts obviously erred.

The local decisions of a state court cannot, as a matter of authority, abro-
gate maritime law.

Under the general maritime law, where the relation of master and servant
exists, an owner of an offending vessel, committing a maritime tort is
responsible, under the rule of *respondeat superior*.

There is no limitation taking municipal corporations out of the reach of
the process of a court of admiralty.

The public nature of the service upon which a vessel is engaged, at the
time of the commission of a maritime tort, affords no immunity from
liability in a court of admiralty, when the court has jurisdiction.

While it is true that the emergency of fire was an element to be considered,
in determining whether or not those in charge of the fire-boat were negli-
gent, it does not follow that it exempted from the exercise of such due
care as the occasion required towards property which was in the path of
the fire-boat as it approached the slip.

A ship, by whomsoever owned or navigated, is liable for an actionable in-
jury resulting from the negligence of the master and crew of the vessel.

A recovery can be had *in personam* for a maritime tort, when the relation
existing between the owner and the master and crew of the vessel, at the
time of the negligent collision, was that of master and servant.

Workman, the libellant below, was the owner, on June 11,
1893, of the British barkentine Linda Park.'   On the date
named, while the vessel was moored to a dock at pier 48 in
the East River in New York City, she was struck and injured
by the steam fire-boat New Yorker.   At the time of the colli-
sion the New Yorker was running into the slip between piers 48
and 49 for the purpose of getting near to another fire-boat which
had shortly prior thereto safely entered the slip.   Both the fire-
boats had been called in order to aid in extinguishing a fire in
a warehouse situated a distance of eighty-five to one hundred

feet from the slip bulkhead. To recover the damage occasioned to his vessel, Workman filed, in the District Court of the United States for the Southern District of New York, a libel *in personam* against the mayor, aldermen and commonalty of the city of New York. This libel was subsequently amended by adding the allegations essential to make, as additional respondents, the fire department of the city of New York and James A. Gallagher, the person in charge of the navigation of the New Yorker at the time of the collision.

The District Court entered a decree in favor of the libellant against the city of New York and Gallagher, and dismissed the libel as to the fire department. 63 Fed. Rep. 298.

The Circuit Court of Appeals, to which the case was taken, affirmed the decree of the District Court against Gallagher and in favor of the fire department. The appellate court, however, reversed that portion of the decree of the District Court which held the city of New York liable, and remanded the case with instructions to dismiss the libel as against the city. 35 U. S. App. 201; 67 Fed. Rep. 347.

The case was then brought to this court by the allowance of a writ of certiorari.

*Mr. Harrington Putnam* for Workman. *Mr. Charles C. Burlingham* was on his brief.

*Mr. Theodore Connoly* for the Mayor, Aldermen and Commonalty of the city of New York and Gallagher. *Mr. John Whalen* and *Mr. James M. Ward* were on his brief.

MR. JUSTICE WHITE, after making the foregoing statement, delivered the opinion of the court.

It is clearly deducible from the record that the courts below concurred in dismissing the libel as against the fire department of the city of New York, upon the contention made in the answer of the department that under the provisions of a named statute of the State of New York, the fire department of the city of New York was neither a corporation nor a *quasi*-cor-

poration, but was merely a department of the city. As no controversy is made respecting the correctness of the decree in this particular, we dismiss this subject from view.

With reference to the decree rendered by both courts against Gallagher, the district judge held that, giving due consideration to the emergency of fire, "the running into the Linda Park arose through lack of reasonable prudence, and was unnecessary and negligent." 63 Fed. Rep. 298. The Circuit Court of Appeals, in its opinion, affirming the decree against Gallagher, said:

"The evidence in the record adequately supports the conclusion of the court below that the injuries caused to the libellant's vessel by the impact of the fire-boat were caused by the negligent manner [management?] of the fire-boat while the latter was trying to reach a convenient location to play upon a burning building near the pier at which the libellant's vessel was moored."

There is no substantial controversy raised on the record as to the premise of fact upon which the personal decree against Gallagher was rendered by both the courts below. And even if such were not the case, the facts upon which Gallagher's liability depends are not now open to controversy, because of the well settled doctrine that where both courts below have concurred in a finding of fact, it will, in this court, be accepted as conclusive, unless it affirmatively appears that the lower courts obviously erred. *The Carib Prince,* 170 U. S. 655, 658, and cases there cited. It is clear that if it was seriously claimed that both the courts below had manifestly erred in their appreciation of the facts as to negligence in the management of the fire-boat, the testimony would not justify the assertion. We shall therefore no further consider this feature of the case.

In order to elucidate the serious question which arises for discussion, we briefly state the reasons by which the courts below were led to reach opposing conclusions as to the liability or non-liability of the city.

The District Court, on the assumption that the local law controlled, determined that by that law, as declared in decisions of the courts of the State of New York, the city was

liable for the injury caused by the negligent management of
its fire-boat. The Circuit Court of Appeals, however, was of
opinion that the city of New York was not answerable for the
injury inflicted, for the reasons which it thus stated. 35 U. S.
App. 204:

"It is familiar law that the officers selected by a municipal
corporation to perform a public service for the general welfare
of the inhabitants or the community, in which the corpora-
tion has no private interest, and from which it derives no special
benefit or advantage in its corporate capacity, are not to be
regarded as the servants or agents of the municipality, and for
their negligence or want of skill it cannot be held liable. This
is so, notwithstanding such officers derive their appointment
from, and are paid by, the corporation itself. In selecting and
employing them, the municipality merely performs a political
or governmental function; the duties intrusted to them do not
relate to the exercise of corporate powers; and hence they are
the agents or servants of the public at large. Upon this prin-
ciple it has uniformly been decided by the courts that municipal
corporations are not liable for the negligence or wrongful acts
of the officers of the police or health departments committed
in the course of their ordinary employment. Unless the duties
of the officers of the fire department are of a different com-
plexion, and they are the servants of the municipality because
they are engaged in performing one of its corporate functions,
the same principle must extend immunity to the municipality
for the negligent acts of these officers and their subordinates.

\*      \*      \*      \*      \*      \*      \*      \*

"It is quite immaterial that the duties of these officers are
defined and the offices created by the charter or organic law of
the municipality ; the test of corporate liability for the acts of
the officers of the municipality depends upon the nature of the
duties with which they are charged; if these, being for the
general good of the public as individual citizens, are govern-
mental, they act for the State. If they are those which prima-
rily and legitimately devolve upon the municipality itself, they
are its agents."

Having thus determined the general principle by which the

liability of the city was to be judged, the court reviewed some of the decisions of the Court of Appeals of New York, and deduced from them that the city, in the operation of the fire-boat, performed a governmental and not a corporate function, and, therefore, under the assumption that the decisions in question were authoritatively controlling, held the city not liable.

Whilst it is contended at bar that the District Court correctly decided, considering the local law of New York alone, that the city was liable, it is also asserted that even if by such law there was no responsibility on the part of the city of New York, nevertheless the Circuit Court of Appeals erred in deciding that the city was not bound, because by the maritime law the liability existed, and such · law should have controlled, although the local law was to the contrary.

We come then to consider first, whether, in the decision of the controversy, the local law of the city of New York or the maritime law should control ; and, second, if the case is solely governed by the maritime law, whether the city of New York is liable.

In examining the first question, that is, whether the local law of New York must prevail, though in conflict with the maritime law, it must be borne in mind that the issue is not—as was the case in *Detroit* v. *Osborne*, (1890) 135 U. S. 492—whether the local law governs as to a controversy arising in the courts of common law or of equity of the United States, but does the local law, if in conflict with the maritime law, control a court of admiralty of the United States in the administration of maritime rights and duties, although judicial power with respect to such subjects has been expressly conferred by the Constitution (art. III, sec. 2) upon the courts of the United States.

The proposition then which we must first consider may be thus stated : Although by the maritime law the duty rests upon courts of admiralty to afford redress for every injury to person or property where the subject-matter is within the cognizance of such courts and when the wrongdoer is amenable to process, nevertheless the admiralty courts must deny all relief whenever redress for a wrong would not be afforded by the local law of a particular State or the course of decisions therein. And this, not

because, by the rule prevailing in the State, the wrongdoer is not generally responsible and usually subject to process of courts of justice, but because in the commission of a particular act causing direct injury to a person or property it is considered, by the local decisions, that the wrongdoer is endowed with all the attributes of sovereignty, and therefore as to injuries by it done to others in the assumed sovereign character, courts are unable to administer justice by affording redress for the wrong inflicted.

The practical destruction of a uniform maritime law which must arise from this premise, is made manifest when it is considered that if it be true that the principles of the general maritime law giving relief for every character of maritime tort where the wrongdoer is subject to the jurisdiction of admiralty courts, can be overthrown by conflicting decisions of state courts, it would follow that there would be no general maritime law for the redress of wrongs, as such law would be necessarily one thing in one State and one in another; one thing in one port of the United States and a different thing in some other port. As the power to change state laws or state decisions rests with the state authorities by which such laws are enacted or decisions rendered, it would come to pass that the maritime law affording relief for wrongs done, instead of being general and ever abiding, would be purely local—would be one thing to-day and another thing to-morrow. That the confusion to result would, amount to the abrogation of a uniform maritime law is at once patent. And the principle by which the maritime law would be thus in part practically destroyed would besides apply to other subjects specially confided by the Constitution to the Federal government. Thus, if the local law may control the maritime law, it must also govern in the decision of cases arising under the patent, copyright and commerce clauses of the Constitution. It would result that a municipal corporation, in the exercise of administrative powers which the state law determines to be governmental, could with impunity violate the patent and copyright laws of the United States or the regulations enacted by Congress under the commerce clause of the Constitution, such as those concerning the enrollment and licensing of vessels.

This follows if a corporation must for a wrong by it done, be allowed to escape all reparation upon the theory that, though ordinarily liable to sue and be sued, it possessed in the particular matter the freedom from suit which attaches to a sovereign State.

The disappearance of all symmetry in the maritime law and the law on the other subjects referred to, which would thus arise, would, however, not be the only evil springing from the application of the principle relied on, since the maritime law which would survive would have imbedded in it a denial of justice. This must be the inevitable consequence of admitting the proposition which assumes that the maritime law disregards the rights of individuals to be protected in their persons and property from wrongful injury, by recognizing that those who are amenable to the jurisdiction of courts of admiralty are nevertheless endowed with a supposed governmental attribute by which they can inflict injury upon the person or property of another, and yet escape all responsibility therefor. It cannot be doubted that the greater part, if not the whole, of the maritime commerce of the country is either initiated or terminated in ports where municipal corporations exist. All the vessels, whether domestic or foreign, in which this vast commerce is carried on, under the rule referred to, could be subjected to injury and wrong without power to obtain redress, since every municipality would be hedged about with the attributes of supreme sovereignty. For the principle which would exempt the municipal owner of a fire-boat from legal responsibility would be equally applicable to boats used by a street department for the removal of refuse, to ferries, to pilot boats, to training-school ships—one of which, it is suggested in argument, the city of New York now actually operates, and to all other vessels which the municipality might consider it necessary or desirable to use. The wrong and injustice which would thus arise need not be commented upon.

The evil consequences growing from thus implanting in the maritime law the doctrine that wrong can be done with impunity were very aptly pointed out in *Mersey Docks and Harbour Board, Trustees,* v. *Gibbs,* (1866) L. R. 1 H. L. 122. In that

case it was sought to hold the dock trustees liable for damage occasioned to a ship and cargo in striking a mud bank while attempting to enter a dock. The trustees asserted an exemption on the ground that they did not collect tolls for their own profit, but merely as trustees for the benefit of the public. Lord Chancellor Cranworth said:

"It would be a strange distinction to persons coming with their ships to different ports of this country, that in some ports, if they sustain damage by the negligence of those who have the management of the docks, they will be entitled to compensation, and in others they will not; such a distinction arising, not from any visible difference in the docks themselves, but from some municipal difference in the constitution of the bodies by whom the docks are managed."

And still later, in deciding the case of *Currie* v. *McKnight*, (1897) A. C. 97, the House of Lords declared that while the admiralty law as known in England differs from the common law of England, and the common law of Scotland differs from the common law of England, because they were derived from divergent sources, yet the admiralty laws were derived both by Scotland and England from the same source, and "it would be strange as well as in the highest degree inconvenient if a different maritime law prevailed in two different parts of the same island."

Potential, however, as may be these arguments, predicated on the inherent injustice of the doctrine contended for, and the serious inconvenience which must result from an attempt to apply it, we are not thereby relieved from considering the question in a more fundamental aspect. In doing so, it becomes manifest that the decisions of this court overthrow the assumption that the local law or decisions of a State can deprive of all rights to relief, in a case where redress is afforded by the maritime law and is sought to be availed of in a cause of action maritime in its nature and depending in a court of admiralty of the United States.

In *The Key City*, (1872) 14 Wall. 623, 660, it was held that Federal courts of admiralty were not governed by state statutes of limitation in the enforcement of maritime liens. In *The*

*Lottawanna*, (1874) 21 Wall. 558, 578, it was held that the maritime law as accepted and received in this country did not confer a lien upon a vessel in favor of those who had furnished necessary materials, repairs and supplies for such vessel in her home port, but that the District Courts of the United States, having jurisdiction of the contract as a maritime one, might enforce liens given for its security, even when created by the state law.

In the course of the opinion, speaking through Mr. Justice Bradley, the court said (pp. 572, 573, 574):

" Whilst it is true that the great mass of maritime law is the same in all commercial countries, yet, in each country, peculiarities exist either as to some of the rules or in the mode of enforcing them. Especially is this the case on the outside boundaries of the law, where it comes in contact with or shades off into the local or municipal law of the particular country and affects only its own merchants or people in their relations to each other."

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

" That we have a maritime law of our own, operative throughout the United States, cannot be doubted. The general system of maritime law which was familiar to the lawyers and statesmen of the country when the Constitution was adopted, was most certainly intended and referred to when it was declared in that instrument that the judicial power of the United States shall extend ' to all cases of admiralty and maritime jurisdiction.' "

" Nor does the Constitution attempt to draw the boundary line between maritime law and local law ; nor does it lay down any criterion for ascertaining that boundary : It assumes that the meaning of the phrase ' admiralty and maritime jurisdiction ' is well understood. It treats this matter as it does the cognate ones of common law and equity, when it speaks of ' cases in law and equity,' or of ' suits at common law,' without defining those terms, assuming them to be known and understood.

" One thing, however, is unquestionable ; the Constitution must have referred to a system of law coextensive with, and operating uniformly in, the whole country. It certainly could

not have been the intention to place the rules and limits of maritime law under the disposal and regulation of the several States, as that would have defeated the uniformity and consistency at which the Constitution aimed on all subjects of a commercial character affecting the intercourse of the States with each other or with foreign States."

In *Liverpool Steam Co.* v. *Phœnix Insurance Co.*, (1889) 129 U. S. 397, 443, a maritime contract executed in New York was held to be an American contract, and the local law of New York was declared not to govern in its construction. In *Butler* v. *Boston Steamship Company*, (1889) 130 U. S. 527—a case growing out of a collision in navigable waters within the territorial boundaries of Massachusetts—it was held that a state statute could not operate to deprive the owner of the offending ship of the benefit of the limited liability act, and that state legislatures could not change or modify the general maritime law. In *The Max Morris*, (1890) 137 U. S. 1, 14, the question for decision was, whether, in a court of admiralty, in a case where recovery was sought for personal injuries to the libellant arising from his negligence, concurring with that of the vessel, " any damages can be awarded, or whether the libel must be dismissed *according to the rule in common law cases.*" (p. 8.) It was held (p. 15) that " The mere fact of the negligence of the libellant as partly occasioning the injuries to him, when they also occurred partly through the negligence of the officers of the vessel, does not debar him entirely from a recovery." In *The J. E. Rumbell*, (1893) 148 U. S. 1, 17, it was held that any priority given by a state statute, or by decisions in common law or in equity, to a mortgage upon a vessel as against a claim for supplies and necessaries furnished to the vessel in her home port, was immaterial, " and that the Federal courts of the United States, enforcing the lien because it is maritime in its nature, arising out of the maritime contract, must give it the rank to which it is entitled by the principles of the maritime and admiralty law."

True, it is well settled that in certain cases where a lien is given by a state statute, the admiralty courts will enforce rights so conferred when not in absolute conflict with the admiralty law. *The Lottawanna*, (1874) 21 Wall. 558. Moreover, it has

been decided that although at the time of the adoption of the Constitution, in courts of admiralty as in courts of common law, a cause of action for a personal injury abated by the death of the injured party, nevertheless, when, by a state statute, a right of recovery in such a case was conferred, the admiralty courts would recognize and administer the appropriate relief. *The Albert Dumois,* (1900) 177 U. S. 257–259, and cases cited. But such cases afford no foundation for the proposition that state laws or decisions can deprive an individual of a right of recovery for a maritime wrong which, under the general principles of the admiralty law, he undoubtedly possessed, and can destroy the symmetry and efficiency of that law by engrafting therein a principle which violates the imperative command of such law that admiralty courts must administer redress for every maritime wrong in every case where they have jurisdictional power over the person by whom the wrong has been committed. The cases in question on the contrary but illustrate the alacrity with which admiralty courts adopt statutes granting the right to relief where otherwise it could not be administered by a maritime court, and they hence do not support the contention that there is a want of power in admiralty courts to give redress in every case within their jurisdiction where the duty to do so is imposed by the maritime law. This distinction is well illustrated by the ruling in *The Max Morris, supra.* There it was asserted that by the universal principles of the common law, as well as of the local laws of the States, no right to recover for a wrong committed could be enforced in favor of one who had himself contributed to the producing cause of the injury. Whilst the premise was conceded, the soundness of the inference deduced from it was denied, and it was held that as by the general principles of the maritime law a measure of relief would be afforded to a person who had suffered a wrong, even although he had contributed thereto, *it was the duty of the admiralty courts to grant relief* in accordance with the principles of the maritime law.

It being then settled that the local decisions of one or more States cannot, as a matter of authority, abrogate the maritime law, we are brought to consider whether, under the maritime

law, the city of New York was liable for the injury inflicted by the fire-boat. As a prerequisite to a solution of this question it is necessary to determine what relation the city of New York bore to the fire-boat and those in control of it.

The fire department of the city of New York, as constituted when the collision in question occurred, was established by chapter 410 of the New York Laws of 1882. In the statute it was declared (sec. 27) that "for all purposes the local administration and government of the city and county of New York shall continue to be in and be performed by the corporation aforesaid," *i. e.* "the mayor, aldermen and commonalty of the city of New York." By section 34 were established eleven enumerated "departments in said city," among them a fire department. By sections 40, 106 and 108, provision was made for a board of fire commissioners, to act as the executive head of the department, to be nominated by the mayor, by and with the consent of the board of aldermen, and to be removable for cause by the mayor, subject to the approval of the governor of the State. The ministerial direction of the affairs of the department, including the preservation of the real and personal property used by it, was confided to this board of commissioners, but the city was made liable for all expenses of maintenance and operation, and was the owner of all the property of the fire department. Sec. 424 *et seq.* In addition to making the city liable for all expenses connected with the maintenance and operation of the department, it was provided in section 450 of the statute that any damage caused by the authorized destruction of buildings to stay the progress of fire should be borne by the city of New York.

In order to emphasize these material facts we repeat that it unquestionably appears that the fire department of the city of New York was an integral branch of the local administration and government of that city. The ministerial officers who directed the affairs of the department were selected and paid by the city; all the expenses of the department of every kind and nature were to be borne by the city, which was bound by all contracts made for such purpose; all the property of the department, including the fire-boats, belonged to the city; and the

city was liable in case of an authorized destruction on land of property of individuals to prevent the spread of a conflagration.

That, upon such a state of things, the relation of master and servant existed between the city of New York and those in charge of the fire-boat is clear. And that under the general maritime law, where the relation of master and servant exists, an owner of an offending vessel committing a maritime tort is responsible, under the rule of *respondeat superior*, is elementary. *Thorpe* v. *Hammond*, (1871) 12 Wall. 408 ; *The Plymouth*, (1866) 3 Wall. 35.

It is not gainsaid that, as a general rule, municipal corporations, like individuals, may be sued ; in other words, that they are amenable to judicial process for the purpose of compelling performance of their obligations. True it is, that under the general law, growing out of the public nature of their duties, where judgments or decrees are entered against municipal corporations, such judgments or decrees may not, as a matter of public policy, be enforced by the levy on property held by the corporation for public uses. *Meriwether* v. *Garrett*, (1880) 102 U. S. 472.

As a result of the general principle by which a municipal corporation has the capacity to sue and be sued, it follows that there is no limitation taking such corporations out of the reach of the process of a court of admiralty, as such courts, within the limit of their jurisdiction, may reach persons having a general capacity to stand in judgment. True, also, where admiralty process has been set in motion against a municipal corporation, public policy, it has been held, restrains a seizure of property used for public purposes by such corporation. *The Fidelity*, (1879) 16 Blatchford, 569. This conclusion, however, is but the application of the exception as to the mode of execution of a judgment or decree against such a corporation, to which we have referred, and its existence in the admiralty law in all cases has also been denied. *The Oyster Police Steamers of Maryland*, (1887) 31 Fed. Rep. 763. Which of these conflicting conclusions, as to the exception in question, is correct, we are not called upon on the present record to determine, since no levy of process upon the fire-boat was made or attempted to be made.

The contention is, although the corporation had general capacity to stand in judgment, and was therefore subject to the process of a court of admiralty, nevertheless the admiralty court would afford no redress against the city for the tort complained. of, because under the local law the corporation as to some of its administrative acts was entitled to be considered as having a dual capacity, one private, the other public or governmental, and as to all maritime wrongs committed in the performance of the latter functions it should be treated by the maritime law as a sovereign. But the maritime law affords no justification for this contention, and no example is found in such law, where one who is subject to suit and amenable to process is allowed to escape liability for the commission of a maritime tort, upon the theory relied upon. We, of course, concede that where maritime torts have been committed by the vessels of a sovereign, and complaint has been made in a court of admiralty, that court has declined to exercise jurisdiction, but this was solely because of the immunity of sovereignty from suit in its own courts. So, also, where, in a court of admiralty of one sovereign, redress is sought for a tort committed by a vessel of war of another nation, it has been held that as by the rule of international comity the sovereign of another country was not subject to be impleaded, no redress could be given. Both of these rules, however, proceed upon the hypothesis of the want of a person or property before the court over whom jurisdiction can be exerted. As a consequence, the doctrine above stated rests not upon the supposed want of power in courts of admiralty to redress a wrong committed by one over whom such courts have adequate jurisdiction, but alone on their inability to give redress in a case where jurisdiction over the person or property cannot be exerted. In other words, the distinction between the two classes of cases is that which exists between the refusal of a court to grant relief because it has no jurisdiction to do so, and the failure of a court to afford redress in a case where the wrong is admitted and jurisdictional authority over the wrongdoer is undoubted.

The decisions of this court clearly expound the principles we have stated. *The Exchange*, (1812) 7 Cranch, 116, involved the

right of a court of admiralty to enforce, by a proceeding *in rem*, an alleged maritime claim against a vessel of war of a foreign nation. The right to relief was denied exclusively because of a want of jurisdiction over the foreign sovereign or his property.

*The Siren*, (1869) 7 Wall. 153, involved the liability of a prize ship in the possession and control of the officers of the United States for an injury inflicted by a collision of the ship with another vessel, averred to have been occasioned by the negligent management of those in charge of the prize ship. In considering the power of the court to adjudicate the controversy, the court said (p. 185):

" For the damages occasioned by collision of vessels at sea a claim is created against the vessel in fault, in favor of the injured party. This claim may be enforced in the admiralty by a proceeding *in rem*, except where the vessel is the property of the United States. In such case the claim exists equally as if the vessel belonged to a private citizen, but for reasons of public policy, already stated, cannot be enforced by direct proceedings against the vessel. It stands, in that respect, like a claim against the government, incapable of enforcement without its consent, and unavailable for any purpose.

" In England, when the damage is inflicted by a vessel belonging to the crown, it was formerly held that the remedy must be sought against the officer in command of the offending ship. But the present practice is to file a libel *in rem*, upon which the court directs the registrar to write to the Lords of the Admiralty requesting an appearance on behalf of the crown —which is generally given—when the subsequent proceedings to decree are conducted as in other cases. Coote's New Admiralty Practice, 31. In the case of *The Athol*, 1 W. Robinson, 382, the court refused to issue a monition to the Lords of the Admiralty to appear in a suit for damage by collision, occasioned to a vessel by a ship of the crown; but the lords having subsequently directed an appearance to be entered, the court proceeded with the case, and awarded damages. As no warrant issues in these cases for the arrest of the vessels of the crown, and no bail is given on the appearance, it is insisted that they

are brought simply to ascertain the extent of the damages, and that the decrees are little more than awards, so far as the government is concerned.    This may be the only results of the suits, but they are instituted and conducted on the hypothesis that claims against the offending vessels are created by the collision. *The Clara*, 1 Swabey, 3, and *The Swallow*, 1 Swabey, 30.    The vessels are not arrested and taken into custody by the marshal, for the reasons of public policy already stated, and for the further reason that it is to be presumed that the government will at once satisfy a decree rendered by its own tribunals in a case in which it has voluntarily appeared."

As the prize vessel had been condemned and sold at the instance of the United States, and the proceeds were in the registry of the court for distribution, the court gave the relief sought against the proceeds of the sale, because the facts stated established, not only the liability of the offending ship, but also furnished the basis of jurisdiction.

The same principle was applied in the later case of *The Davis*, (1869) 10 Wall. 15, where it was held that personal property of the United States on board of a vessel for transportation from one point to another was liable to a lien for salvage service rendered in saving the property from a peril of the sea, and that such lien might be enforced by a proceeding *in rem*, when the process of the court might be used without disturbing the possession of the government.

The statement of the maritime law of England on the subject now being considered made in *The Siren, supra*, makes it clear that, in harmony with the maritime law of this country, the fact that a wrong has been committed by a public vessel of the crown affords no ground for contending that no liability arises, because of the public nature of the vessel, although, it may be, in consequence of a want of jurisdiction over the sovereign, redress cannot be given.    This is well illustrated by the cases to which we shall now refer.

*The Athol*, (1842) 1 Wm. Rob. 374, was the case of a British troopship which had run down a brig in the English Channel. The Lords of the Admiralty having refused a petition for compensation, the owner of the brig applied to the High Court of

Admiralty to decree a monition to issue against those officials. In declining to issue the monition, for want of power, Dr. Lushington said (p. 382):

"Under the circumstances of this case then, both upon principle and the authority of decided cases, I must decline to issue the monition as prayed. At the same time, sitting here as a judge, in a court of justice, I am bound to express the opinion that I cannot apprehend the high personages who represent Her Majesty in her office of Admiralty, will avoid doing justice, or that, upon a due consideration, they will take upon themselves to say, that they will be themselves the exclusive judges upon the merits of the present case. Whether they shall appear or not, is not a matter for this court to determine. I decline to grant the monition."

The Lords of the Admiralty subsequently directed that an appearance should be made on behalf of *The Athol,* and as by this act the court had jurisdiction to determine the controversy, it did so, held *The Athol* to have been in fault, and, despite the public nature of the vessel, "the damages and costs were pronounced for."

*The Parlement Belge,* (1879) 4 P. D. 129, was an action instituted on behalf of the owners of a steam tug against the steamship Parlement Belge and her freight to recover damages sustained by the tug in a collision with the steamship. The latter vessel was, at the time of the collision and when the action was instituted, a public vessel of the Government of the sovereign state of Belgium, navigated and employed by and in the possession of such government, and officered by officers of the royal Belgium navy, holding commissions from His Majesty, the King of Belgium, and in the pay and service of his government. Besides carrying the mails, between Dover and Ostend, the Parlement Belge carried passengers and merchandise, and was employed in earning passage-money and freight. Sir Robert Phillimore declared (p. 144) that the case was one of first impression, and to be decided upon general principles and the analogies of law rather than upon any direct precedent, and it was held that the Parlement Belge did not come within the category of a ship of war or a pleasure vessel belonging to the

crown of Belgium, and was not exempt from the process of the court. On appeal, however, (5 P. D. 197,) it was held that the admiralty court was concluded by the declaration of the sovereign authority that the vessel was a public vessel of the state, and, further, that the mere fact of the ship having been used subordinately for trading purposes did not take away the immunity attaching to the public vessel of an independent sovereignty, and that the vessel could not be proceeded against.

It results that, in the maritime law, the public nature of the service upon which a vessel is engaged at the time of the commission of a maritime tort affords no immunity from liability in a court of admiralty, where the court has jurisdiction. This being so, it follows that as the municipal corporation of the city of New York, unlike a sovereign, was subject to the jurisdiction of the court, the claimed exemption from liability asserted in the case at bar, because of the public nature of the service upon which the fire-boat was engaged—even if such claim for the purposes of the case be conceded—was without foundation in the maritime law, and therefore afforded no reason for denying redress in a court of admiralty for the wrong which the courts below both found to have been committed.

And these considerations would dispose of the case, were it not for two subordinate contentions which we deem it essential to notice before reaching a conclusion. The first, as expressed in the brief of counsel, is that the injury to the Linda Park should have been held to have been the result of inevitable accident, because " whatever was done in regard to the navigation of the New Yorker was done in the excitement of the moment, and in view of the extent of not only the possible but probable spread of the fire, under pressure of necessity." Pausing for a moment to analyze this contention it results that it involves the self-destructive assumptions that the maritime law, in order to render the person and property of the individual safe, in case of an emergency arising from the happening of fire, causes both the person and property of the individual to be unsafe, since without necessity and through negligence injury can be inflicted or destruction be brought about, without power, in the admiralty courts, to redress the wrong, although the wrongdoer

be amenable to their jurisdiction. But, while it is true that the emergency of fire was an element to be considered in determining whether or not those in charge of the fire-boat were negligent on the occasion in question, since negligence is relative, that is, depends upon whether there was an absence of the care which it was the duty to exercise under the particular circumstances. But it does not follow that the emergency of fire exempted from the exercise of such due care as the occasion required towards property which was in the path of the fire-boat as it approached the slip for the purpose of getting into a position where it might assist in extinguishing the fire in question.

This principle has been heretofore applied by this court. Thus, in *The Clarita*, (1875) 23 Wall. 1, a tugboat, whose business it was to give relief to vessels on fire, in towing a vessel on fire from out of a dock, used a manila hawser. While so engaged the hawser was burnt, and the burning vessel getting loose from the tug, drifted, and set fire to another vessel. It was urged upon the court "that it is the interest of shipping that an enterprising company, like the one which owned this tug —a company which at great expense fits up a tug with powerful steam pumps, and keeps the vessel with her fires banked, night and day, to move on a moment's notice everywhere about a harbor for useful service—should be encouraged;" and the emergency of the occasion it was claimed ought to exempt from liability. In holding that the tug was in fault this court said (p. 15):

"Even ordinary experience and prudence would have suggested that the part of the hawser made fast to the ferryboat should be chain, and that it would be unsafe to use a hawser made of manila. Where the danger is great the greater should be the precaution, as prudent men in great emergencies employ their best exertions to ward off the danger. Whether they had a chain hawser on board or not does not appear, but sufficient does appear to satisfy the court that one of sufficient length to have prevented the disaster might easily have been procured, even if they were not supplied with such an appliance."

And in accord with this doctrine is the local law of New

York. Thus, in *Farley* v. *Mayor*, (1897) 152 N. Y. 222, in speaking of the obligation to exercise due care devolving upon the driver of a fire engine, while responding to an alarm of fire, the court said (p. 227):

"The conduct of the plaintiff was for the consideration of the jury. . . . He was bound in driving to exercise the care which a prudent person would ordinarily exercise under similar circumstances. It was for the jury to say whether he was alert on this occasion, watchful to avoid obstructions which might be in his path, and whether there was any omission on his part of reasonable circumspection and diligence which contributed to the accident."

And indeed, although there are a number of cases holding that a municipal corporation is not liable for a positive injury to the person or property of an individual inflicted by its fire department, they do not rest upon the doctrine of emergency, which we are now considering. On the contrary, *all these cases but expound the theory of sovereign attribute*, which we have seen does not control the maritime law, and cannot justify an admiralty court in refusing to redress a wrong where it has jurisdiction to do so.

The remaining suggestion is that as a proceeding *in rem* could not have been maintained against the fire-boat because it was the property of the city of New York, and therefore an instrumentality employed in the performance of its municipal functions, no action *in personam* was available to the owner of the injured vessel. As we at the outset said, there is contrariety of opinion in the lower admiralty courts of the United States as to whether the rule of the courts of common law which exempts from seizure the property of a municipality devoted to its municipal uses obtains in a court of admiralty of the United States. This conflict, as we have also said, we deem it unnecessary to determine in this case, because, even if it be conceded that the fire-boat could not have been seized by process from a court of admiralty, the proposition that, therefore, the owner could not be called upon, in an action *in personam*, to respond for the damages inflicted by the boat, is without foundation. Of course, as has been repeatedly declared by this

court, by the general admiralty law of this country, subject to the exemption from process possessed by the national government, a ship, by whomsoever owned or navigated, is liable for an actionable injury resulting from the negligence of the master and crew of such vessel. *The John G. Stevens,* (1898) 170 U. S. 113, 120, and cases cited, 122. A liability of the owners *in personam,* however, is not dependent upon ability to maintain a proceeding *in rem* because of the maritime tort. A maritime lien may not exist in a cause of collision, for instance, when the thing occasioning the tort was not the subject of a maritime lien, *The Rock Island Bridge,* (1867) 6 Wall. 213; or such a lien, if it exist, may not be enforceable, and so may be said to render the offending thing not the subject of a maritime lien, because of the ownership and possession of such thing being in the government of the nation. *The Siren,* (1869) 7 Wall. 152. Or the remedy *in rem* may not be available owing to the offending thing being actually in another country, or because of its loss intermediate the collision and the institution of legal proceedings.

A recovery can be had *in personam,* however, for a maritime tort when the relation existing between the owner and the master and crew of the vessel, at the time of the negligent collision, was that of master and servant. *Thorpe* v. *Hammond,* (1871) 12 Wall. 408; *The Plymouth,* (1866) 3 Wall. 35.

The prerequisite in admiralty to the right to resort to a libel *in personam* is the existence of a cause of action, maritime in its nature. That a collision upon navigable waters of the United States, between vessels, by the fault of one of such vessels, creates a maritime tort and a cause of action within the jurisdiction of a court of admiralty, is of course unquestioned. And, as said by this court in *In re Louisville Underwriters,* (1890) 134 U. S. 488, 490:

"By the ancient and settled practice of courts of admiralty, a libel *in personam* may be maintained for any cause within their jurisdiction, wherever a monition can be served upon the libellee, or an attachment made of any personal property or credits of his."

Because we conclude that the rule of the local law in the

State of New York—conceding it to be as held by the Circuit Court of Appeals—does not control the maritime law, and, therefore, affords no ground for sustaining the non-liability of the city of New York in the case at bar, we must not be understood as conceding the correctness of the doctrine by which a municipal corporation, as to the discharge of its administrative duties, is treated as having two distinct capacities, the one private or corporate, and the other governmental or sovereign, in which latter it may inflict a direct and positive wrong upon the person or property of a citizen without power in the courts to afford redress for such wrong. That question, from the aspect of both the common and municipal law, was considered by this court in *Weightman* v. *Corporation of Washington*, (1861) 1 Black, 39; *Barnes* v. *District of Columbia*, (1875) 91 U. S. 540; and in *District of Columbia* v. *Woodbury*, (1890) 136 U. S. 480. And although this opinion is confined to the controlling effect of the admiralty law, we do not intend to intimate the belief that the common law which benignly above all considers the rights of the individual, yet gives its sanction to a principle which denies the duty of courts to protect the rights of the individual in a case where they have jurisdiction to do so. For these reasons we are sedulous to say that we must not be understood as in anywise doubting the correctness of the doctrines expounded by this court in the cases just cited or as even impliedly approving contentions which may conflict with the principles announced in those cases.

Our conclusion is that the District Court rightly decided that the mayor, aldermen and commonalty of the city of New York were liable for the damages sustained by the owner of the *Linda Park*.

*The decree of the Circuit Court of Appeals for the Second Circuit is reversed, and the decree of the District Court is affirmed.*

MR. JUSTICE GRAY, for himself and MR. JUSTICE BREWER, MR. JUSTICE SHIRAS and MR. JUSTICE PECKHAM, dissenting.

We are unable to concur in this decision; and the case ap-

Justices Gray, Brewer, Shiras and Peckham, dissenting.

pears to us of such importance as to warrant, if not to require, a statement of the grounds of our dissent.

The question presented by the record is whether the owner of a vessel lying at a dock in the port of New York can maintain a libel in admiralty *in personam* against the city of New York for an injury to his vessel from being run into through the negligence of those in charge of a fire-boat, owned by the city and in the custody and management of its fire department, while hastening to assist in putting out a fire raging in a building at the head of the dock.

We had supposed it to be well settled, on authority and on principle, that no private suit could be maintained against a municipal corporation for an injury to person or property caused by negligence of members of its fire department while engaged in the performance of their official duties.

How far a municipal corporation may be held liable to a private action for the neglect of itself, or of its officers, in the performance of duties imposed upon it or upon them by law, is a subject upon which, in some of its aspects, there has been much difference of opinion in the courts of this country.

The difference has been most marked in actions against a city for injuries from a defect in a highway which the city is bound by its charter to repair. Such actions, when not expressly given by statute, have been held not to be maintainable by the courts of the New England States, and by those of New Jersey, Michigan, Wisconsin, South Carolina, Arkansas and California; but have been held to be maintainable by the courts of every other State in which the question has arisen. The decisions upon that point, in either class of States, are fully collected in 1 Shearman & Redfield on Negligence (5th ed.), §§ 258, 289.

What kinds of cases may fall within the same rule has been the subject of much doubt and discussion. But it has never, so far as we are aware, been held by the highest court of any State, that an action at law may be maintained against a municipal corporation for any injury to person or property caused by the negligence of the members of its fire department while engaged in the line of their duty.

It is not only in States whose courts hold that, unless author-

·ized by express statute, no action can be maintained against a city for the neglect of itself or its officers to keep a highway in repair—as throughout New England, and in New Jersey, Wisconsin and California—that no action has been held to be maintainable against a city for negligence of members of its fire department while discharging their duty as such. *Hafford* v. *New Bedford*, (1860) 16 Gray, 297 ; *Fisher* v. *Boston*, (1870) 104 Mass. 87 ; *Pettingell* v. *Chelsea*, (1894) 161 Mass. 368 ; *Burrill* v. *Augusta*, (1886) 78 Maine, 118 ; *Edgerly* v. *Concord*, (1879) 59 New Hampshire, 78, and (1882) 62 New Hampshire, 8 ; *Welsh* v. *Rutland*, (1883) 56 Vermont, 228 ; *Dodge* v. *Granger*, (1892) 17 Rhode Island, 664 ; *Jewett* v. *New Haven*, (1870) 38 Connecticut, 368 ; *Wild* v. *Paterson*, (1885) 18 Vroom, (47 N. J. Law) 496 ; *Hayes* v. *Oshkosh*, (1873) 33 Wisconsin, 314 ; *Howard* v. *San Francisco*, (1875) 51 California, 52.

But the same view has prevailed in those States where a different view is taken of the question of the liability of cities for defects in highways and bridges. In the States of New York, Pennsylvania, Ohio, Illinois, Kentucky, Missouri, Mississippi, Iowa, Minnesota, Nebraska and Washington, (as appears in Shearman and Redfield on Negligence, *ubi supra*,) cities are held liable to private actions for damages from defects in highways. Yet in each of those States it has been adjudged that cities are not liable to actions for negligence of members of their fire department engaged in the line of their duty.

In the case at bar, the decree of the District Court in favor of the libellant against the city of New York proceeded upon the ground that by the local law of New York an action could be maintained against the city by the owner of property injured by the negligence of members of its fire department. The Circuit Court of Appeals came to the opposite conclusion ; and upon careful examination of the New York decisions we are satisfied that the Circuit Court of Appeals was right upon that question.

In the Court of Appeals of the State of New York, the law has long been settled that a municipal corporation having a charter from the State, which requires it to construct and maintain highways and bridges, is liable to a person suffering injury

in person or property by a defect in the construction or repair of either by the negligence of the commissioner of highways. *Hutson* v. *New York,* (1853) 9 N. Y. 163; *Conrad* v. *Ithaca,* (1857) 16 N. Y. 158, 161; *Requa* v. *Rochester,* (1871) 45 N. Y. 129; *Hume* v. *New York,* (1878) 74 N. Y. 264; *Ehrgott* v. *New York,* (1884) 96 N. Y. 264; *Hughes* v. *Monroe,* (1895) 147 N. Y. 49, 57; *Missano* v. *New York,* (1899) 160 N. Y. 123.

But that court has constantly held otherwise in regard to negligence of members of the fire department, the police department, or even of the department of public charities, of public health, or of public instruction.

In *Maxmilian* v. *New York,* (1875) 62 N. Y. 160, which has always been considered a leading case, Judge Folger, delivering the unanimous judgment of the court, said: " There are two kinds of duties which are imposed upon a municipal corporation: One is of that kind which arises from the grant of a special power, in the exercise of which the municipality is as a legal individual; the other is of that kind which arises, or is implied, from the use of political rights under the general law, in the exercise of which it is as a sovereign. The former power is private, and is used for private purposes; the latter is public, and is used for public purposes. The former is not held by the municipality as one of the political divisions of the State; the latter is. In the exercise of the former power, and under the duty to the public which the acceptance and use of the power involves, a municipality is like a private corporation, and is liable for a failure to use its power well, or for an injury caused by using it badly. But where the power is intrusted to it as one of the political divisions of the State, and is conferred not for the immediate benefit of the municipality, but as a means to the exercise of the sovereign power for the benefit of all citizens, the corporation is not liable for non-user nor for mis-user by the public agents." 62 N. Y. 164, 165. The previous decisions holding municipal corporations liable to private actions for defects in highways or bridges were placed upon the ground that " the duty of keeping in repair streets, bridges and other common ways of passage, and sewers, and a liability for a neg-lect to perform that duty, rest upon an express or implied

acceptance of the power, and an agreement so to do. It is a duty with which the city is charged for its own corporate benefit, to be performed by its own agents, as its own corporate act." 62 N. Y. 170. But it was adjudged that the city was not liable for a personal injury caused by the negligence of the driver of an ambulance employed by the commissioners of public charities and correction, because the powers and duties of those commissioners were such as were to be exercised and performed, in every local political division of the State, not for the peculiar benefit of that division, but for the whole public, in the discharge of its duty to care for paupers, lunatics and prisoners. 62 N. Y. 168.

In *Ham* v. *New York*, (1877) 70 N. Y. 459, the decision in *Maxmilian's* case was approved, and was followed in holding that the city was not liable to one whose property was injured in consequence of the negligent construction of a schoolhouse by the department of public instruction of the city.

More directly in point is *Smith* v. *Rochester*, (1879) 76 N. Y. 506, in which it was held that no action against the city could be maintained by a person injured by the negligent driving of a hose cart along the street, pursuant to a vote of the city council directing the fire department to assemble in front of the city hall at midnight, as part of a celebration of the centennial anniversary of the National Independence. The judgment was put, not only upon the ground that the city had no authority to employ the horses and wagons of the fire department for a midnight parade of the fire department to celebrate the centennial anniversary of the Nation, but upon the additional and distinct ground that, assuming that the city had such authority under the statutes of New York, " the difficulty in maintaining the plaintiff's action is the well settled rule, that a municipal corporation is not liable for the negligence of firemen while engaged in the line of their duty." 76 N. Y. 513.

In *Terhune* v. *New York*, (1882) 88 N. Y. 247, it was held that an officer of the fire department could not maintain an action against the city for his wrongful dismissal from office by the fire commissioners, because, as was said by Judge Earl, citing the cases of *Maxmilian*, of *Ham* and of *Smith*, above

referred to, "the fire commissioners were public officers, and not agents of the city." 88 N. Y. 251. See also *Springfield Ins. Co.* v. *Keeseville,* (1895) 148 N. Y. 46.

Quite in line with these decisions is *Farley* v. *New York,* (1897) 152 N. Y. 222, 227, which was an action by the driver of a hose carriage against the city to recover damages for injuries caused by driving against an obstruction in the highway. The New York statute of 1882, c. 410, (consolidating the laws affecting public interests in the city of New York,) provides in § 444 that "the officers and men of the fire department, with their apparatus of all kinds, when on duty, shall have the right of way at any fire, and in any highway, street or avenue, over any and all vehicles of any kind, except those carrying United States mails;" and in § 1932 that no person shall drive or ride any horse through any street in the city faster than five miles an hour. The Court of Appeals, speaking by Chief Justice Andrews, said: "The safety of property and the protection of life may and often do depend upon celerity of movement, and require that the greatest practicable speed should be permitted to the vehicles of the fire department in going to fires. Section 1932 was intended to regulate the speed of horses travelling on the streets and using them for the ordinary purposes of travel, and from the nature of the exigency cannot apply to the speed of vehicles of the fire department on their way to fires." The further decision that negligence on the part of the driver would defeat his action against the city has no tendency to show that such negligence could render the city liable to third persons.

In the very recent case of *Missano* v. *New York,* 160 N. Y. 123, in which it was held that keeping the streets clean stood upon the same ground as keeping them in repair, and that the city was therefore liable for a personal injury caused by the negligence of the driver of an ash cart of the street-cleaning department, the court again affirmed the established distinction between such cases and those in which the corporation exercised a public and governmental power for the benefit of the whole public and as the delegate and representative of the State; and quoted with approval the statement of Judge Wallace in a simi-

lar case in the Circuit Court of the United States, where, speaking of the commissioner of the street-cleaning, he said, " His duties, unlike those of the officers of the departments of health, charities, fire and police, although performed incidentally in the interest of the public health, are more immediately performed in the interest of the corporation itself which is charged with the obligation of maintaining its streets in fit and suitable condition for the use of those who resort to them." *Barney Co.* v. *New York,* (1889) 40 Fed. Rep. 50. See also *Hughes* v. *Auburn,* (1899) 161 N. Y. 96, 103, 104; and the decisions of the District Court of the United States for the Southern District of New York in *Haight* v. *New York,* (1885) 24 Fed. Rep. 93, and in *Edgerton* v. *New York,* (1886) 27 Fed. Rep. 230.

The highest courts of the States of Pennsylvania, Ohio, Illinois, Kentucky, Missouri, Mississippi, Iowa, Minnesota, Nebraska and Washington, also, as already mentioned, have adjudged that no private action can be maintained to recover damages against a city for an injury caused by negligence of members of its fire department while engaged in their official duties. The decisions are so uniform, and treat the point as so well settled, that it is enough to cite them, without stating them in detail. They are as follows: *Knight* v. *Philadelphia,* (1884) 15 Penn. Weekly Notes, 307; *Fire Insurance Patrol* v. *Boyd,* (1888) 120 Penn. St. 624, 646; *Kies* v. *Erie,* (1890) 135 Penn. St. 144, 149; *Frederick* v. *Columbus,* (1898) 58 Ohio St. 538, 546; *Wilcox* v. *Chicago,* (1883) 107 Illinois, 334, 338–340; *Greenwood* v. *Louisville,* (1877) 13 Bush, 226; *Davis* v. *Lebanon,* (Kentucky, 1900) 57 Southwestern Reporter, 471; *Heller* v. *Sedalia,* (1873) 53 Missouri, 159; *McKenna* v. *St. Louis,* (1878) 6 Missouri App. 320; *Alexander* v. *Vicksburg,* (1891) 68 Mississippi, 564; *Saunders* v. *Fort Madison,* (Iowa, 1900) 82 Northwestern Reporter, 428; *Grube* v. *St. Paul,* (1886) 34 Minnesota, 402; *Gillespie* v. *Lincoln,* (1892) 35 Nebraska, 34, 46; *Lawson* v. *Seattle,* (1893) 6 Wash. St. 184.

The law on this point, as understood and administered throughout the country by the highest courts of all the States in which the question has arisen, is unqualifiedly recognized by the principal text-writers. Mr. Dillon, for instance, after observing that

JUSTICES GRAY, BREWER, SHIRAS and PECKHAM, dissenting.

" police officers appointed by a city are not its agents or servants, so as to render it responsible for their unlawful or negligent acts in the discharge of their duties," goes on to say : " So, although a municipal corporation has power to extinguish fires, to establish a fire department, to appoint and remove its officers, and to make regulations in respect to their government and the management of fires, it is not liable for the negligence of firemen appointed and paid by it, who, when engaged in their line of duty upon an alarm of fire, ran over the plaintiff, in drawing a hose-reel belonging to the city, on their way to the fire ; nor for injuries to the plaintiff, caused by the bursting of the hose of one of the engines of the corporation, through the negligence of a member of the fire department ; nor for negligence whereby sparks from the fire engine of the corporation caused the plaintiff's property to be burned. The exemption from liability, in these and like cases, is upon the ground that the service is performed by the corporation in obedience to an act of the legislature ; is one in which the corporation, as such, has no particular interest and from which it derives no special benefit in its corporate capacity ; that the members of the fire department, although appointed by the city corporation, are not the agents and servants of the city for whose conduct it is liable ; but they act rather as officers of the city, charged with a public service, for whose negligence in the discharge of official duty no action lies against the city without being expressly given ; and the maxim of *respondeat superior* has therefore no application." 2 Dillon on Municipal Corporations (4th ed.), §§ 975, 976. See also 1 Shearman and Redfield on Negligence, § 265 ; Tiedeman on Municipal Corporations, § 333*a ;* 1 Beach on Public Corporations, § 744 ; 13 Amer. & Eng. Ency. of Law (2d ed.), 78.

The libellant relied on *Mersey Docks* v. *Gibbs*, L. R. 1 H. L. 93, in which the members of the town council of Liverpool and their successors, who had been formed by acts of Parliament into a corporation by the style of the Trustees of the Liverpool Docks, were held liable to an action for an injury to a vessel from a bank of mud which had been negligently suffered to remain in the docks. That decision proceeded upon the ground that the trustees of the docks were one of those corporations

JUSTICES GRAY, BREWER, SHIRAS and PECKHAM, dissenting.

formed for trading and other profitable purposes, and in their very nature substitutions on a large scale for individual enterprise; supplying to those using the docks the same accommodation and the same services that would have been supplied by ordinary dock proprietors to their customers; and being paid for such accommodation and services sums of money, constituting a fund which, although not belonging to them for their own use, was devoted to the maintenance of the works, and presumably to pay claims against the corporation for injuries caused by their negligence. See L. R. 1 H. L. 105–107, 122. It was of such bodies, that Lord Cranworth, after observing that the fact that the appellants, in whom the docks were vested, did not collect tolls for their own profit, but merely as trustees for the benefit of the public, made no difference in principle in respect to their liability, went on to say: "It would be a strange distinction to persons coming with their ships to different ports of this country, that in some ports, if they sustain damage by the negligence of those who have the management of the docks, they will be entitled to compensation, and in others they will not; such a distinction arising, not from any visible difference in the docks themselves, but from some municipal difference in the constitution of the bodies by whom the docks are managed."

But the city of New York, in establishing and carrying on a fire department, is not a substitution for individual enterprise; nor does it perform any such services as ordinary individuals might perform to their customers; nor does it receive any compensation for the use of the fire-boat, or from those benefited by the acts of the fire department.

The decisions of this court contain nothing, to say the least, inconsistent with the conclusion that no action at law could be maintained in such a case as this.

This court, taking the same view of the liability of municipal corporations to actions at law for injuries caused by defects in highways or bridges, which has prevailed in New York and in most of the States, has held that an action of that kind may be maintained in the courts of the District of Columbia; *Weightman* v. *Washington*, (1861) 1 Black, 39; *Barnes* v. *District of*

*Columbia,* (1875) 91 U. S. 540; *District of Columbia* v. *Woodbury,* (1890) 136 U. S. 450; *Bauman* v. *Ross,* (1897) 167 U. S. 548, 597; or in the courts of a Territory; *Nebraska City* v. *Campbell,* (1862) 2 Black, 590; or in the Circuit Court of the United States held in a State whose courts maintain such an action, as in New York, *New York* v. *Sheffield,* (1866) 4 Wall. 189; in Illinois, *Chicago* v. *Robbins,* (1862) 2 Black, 418, and (1866) 4 Wall. 657, and *Evanston* v. *Gunn,* (1878) 99 U. S. 660; in Virginia, *Manchester* v. *Ericsson,* (1881) 105 U. S. 347; or in Ohio, *Cleveland* v. *King,* (1889) 132 U. S. 295; but that in a State where, as in Michigan, its highest court holds that a municipal corporation is not liable to such an action, no such action will lie in the Circuit Court of the United States, because, as was said by Mr. Justice Brewer in delivering judgment, the question "is not one of general commercial law; it is purely local in its significance and extent." *Detroit* v. *Osborne,* (1890) 135 U. S. 492, 498.

In the leading case of *Weightman* v. *Washington,* which was an action against the city of Washington for injuries caused by a defect in a bridge, the court said: "In view of the several provisions of the charter, not a doubt is entertained that the burden of repairing or rebuilding the bridge was imposed upon the defendants in consideration of the privileges and immunities conferred by the charter." 1 Black, 51. And the court took occasion, by way of precaution, to observe that powers granted by the legislature to a municipal corporation to pass ordinances prescribing and regulating the duties of policemen and firemen "are generally regarded as discretionary, because, in their nature, they are legislative; and although it is the duty of such corporations to carry out the powers so granted and make them beneficial, still it has never been held that an action on the case would lie against the corporation, at the suit of an individual, for the failure on their part to perform such a duty." 1 Black, 49.

In *Barnes* v. *District of Columbia,* the action was for a defect in a street in the District of Columbia, constituted a municipal corporation by the act of Congress of February 21, 1871, c. 62, which vested in a board of public works appointed by the

President, the entire control and regulation of the streets, avenues and alleys of the city. 16 Stat. 419, 427. The decision proceeded upon the ground that the care of the streets was "peculiarly a municipal duty," and that the board of works, being charged by Congress with the exclusive control of the streets, was, in that respect, like an ordinary agent of the city, and its proceedings were proceedings of the city. 91 U. S. 547, 555.

But there is no ground for assuming that the duty of putting out fires was imposed upon the city of New York "in consideration of the immunities and privileges conferred by the charter," or was "peculiarly a municipal duty."

In *Bowditch* v. *Boston*, (1879) 101 U. S. 16, it was adjudged that no action would lie, either at common law or by statute, against the city of Boston to recover damages for the destruction of a building, blown up under a general order of the chief engineer of the city to prevent the spreading of a conflagration; that the action, not being maintainable at common law, could only be supported by an express statute; and that the statutes of Massachusetts, as construed by the highest court of the State, did not authorize such an action against the city, except for the destruction of a building by specific order of three firewards or engineers acting jointly. In support of the position that the action would not lie at common law, this court relied on the ancient rule, as stated by Coke, that "for the commonwealth a man shall suffer damage; as, for saving of a city or town, a house shall be plucked down if the next be on fire; and a thing for the commonwealth every man may do without being liable to an action." *Case of the King's Prerogative in Saltpetre*, 12 Rep. 12, 13. The expression "the commonwealth" was evidently used by Coke as equivalent to "the common weal" or "the public welfare;" for he added, after the proposition above quoted, "as it is said in 3 H. 8, fol. 15," evidently intending to refer to the Year Book of 13 Hen. VIII, 15, 16, in which the rule is introduced by the words "the common wealth shall be preferred before private wealth;" and in a statement of the rule in a case in 29 Hen. VIII the corresponding expression is "the common weal." *Maleverer* v. *Spinke*, Dyer, 35a, 36b.

JUSTICES GRAY, BREWER, SHIRAS and PECKHAM, dissenting.

The precise question whether a municipal corporation is liable to an action at law for injuries caused by negligence of members of its fire department has never been decided or considered by this court.

But the principles affirmed and illustrated in the authorities already cited forbid the maintenance of a private action against a municipal corporation for injuries caused by the negligence of members of a fire department, while engaged in the performance of their official duties.

The putting out of fires which are in danger of spreading is for the benefit of the whole public, and for the protection of the property of all. The danger is so great and imminent that it is especially one of those cases in which the public safety must be preferred to private interests. *Salus populi suprema lex.* It is the public good, the general welfare, that justifies the destruction of neighboring buildings to prevent the spreading of a fire which as yet rages in one building only. The duty of protecting, so far as may be, all property within the State against destruction by fire, is a public and governmental duty, which rests upon the government of the State; and it does not cease to be a duty of that character because the State has delegated it to, or permitted it to be performed by, a municipal corporation. When entrusted by the legislature to a municipal corporation, a political division of the State, it is not for the peculiar benefit of that corporation or division, but for its benefit in common with the whole public. A fire department is established in a municipality, not merely for the protection of buildings and property within the municipality itself, but equally for the protection of buildings and property beyond its limits, to which a fire originating within those limits may be in danger of spreading. Moreover, the necessity and appropriateness of the course and measures to be taken to stay a conflagration must be promptly determined, in the first instance, by those charged with the performance of the duty at the time of the exigency; and often cannot be as accurately judged of long after the fact. The members of the fire department of a city, therefore, whether appointed by the municipal corporation or otherwise, are not mere agents or servants of the corporation,

but are public officers charged with a public service; and for their acts or their negligence in the performance of this service no action lies against the corporation, unless expressly given by statute.

It appears to us to be equally clear that no suit upon a like cause of action can be maintained in a court of admiralty; or, as expressed by the Circuit Court of Appeals in this case, "That the suit is brought in a court of admiralty instead of a common law court, and that the negligence consisted in the improper navigation of the vessel, cannot affect the conclusion." 35 U. S. App. 204.

It was argued that all the admiralty courts of the United States should be governed by one rule of maritime law, without regard to local decisions. Such is doubtless the case in the courts of admiralty, as it is in the other courts of the United States, upon questions of general commercial law. *Liverpool Steam Co.* v. *Phenix Ins. Co.*, (1889) 129 U. S. 397, 443. Courts of admiralty are also governed by their own rules, and not by the common law or by local statute, in matters affecting their own jurisdiction and procedure, as, for instance, in regard to the rules of navigation in navigable waters; *The New York*, (1855) 18 How. 223.; to the limitation of the liability of shipowners; *Butler* v. *Boston Steamship Co.*, (1889) 130 U. S. 527; to the duration, the enforcement and the marshalling of maritime liens; *The Chusan*, (1842) 2 Story, 455, 462; *The Lottawanna*, (1874) 21 Wall. 558; *The J. E. Rumbell*, (1893) 148 U. S. 1, 17; and of the effect of contributory negligence of a suitor upon his right to recover and upon the assessment of damages. *Atlee* v. *Packet Co.*, (1874) 21 Wall. 389, 395; *The Max Morris*, (1890) 137 U. S. 1. But the decision of this case does not turn upon any such question.

By the general admiralty law of this country, often declared by this court, a ship, by whomsoever owned or navigated, is liable for an actionable injury resulting from the negligence of her master or crew to another vessel. *The Malek Adhel*, (1844) 2 How. 210, 233, 234; *The China*, (1868) 7 Wall. 53, 68; *Ralli* v. *Troop*, (1895) 157 U. S. 386, 403; *The John G. Stevens*, (1898) 170 U. S. 113, 120. But that does not warrant the inference

JUSTICES GRAY, BREWER, SHIRAS and PECKHAM, dissenting.

that a libel *in personam* can be maintained against the owner for a tort which would neither sustain a libel *in rem* against the ship, nor an action at law against her owner.

There is no case, we believe, in which a libel in admiralty has been maintained by this court, as for a tort, upon a cause of action on which, by the law prevailing throughout the country, no action at law could be maintained. On the contrary, it has repeatedly held that, as no action lies at common law for the death of a human being, no suit for a death caused by the negligence of those in charge of a vessel on navigable waters, either within a State or on the high seas, can be maintained in admiralty in the courts of the United States, in the absence of an act of Congress, or a statute of the State, giving a right of action therefor; and in delivering judgment in the leading case Chief Justice Waite said: " We know of no country that has adopted a different rule on this subject for the sea from that which it maintains on the land, and the maritime law, as accepted and received by maritime nations generally, leaves the matter untouched." " The rights of persons in this particular under the maritime law of this country are not different from those under the common law, and as it is the duty of courts to declare the law, not to make it, we cannot change the rule." *The Harrisburg,* (1886) 119 U. S. 199, 213; *The Alaska,* (1889) 130 U. S. 201; *The Corsair,* (1892) 145 U. S. 335; *The Albert Dumois,* (1900) 177 U. S. 240, 259.

The cases of *The Siren,* (1868) 7 Wall. 152, and *The Davis,* (1869) 10 Wall. 15, related wholly to claims against the United States, as compared with claims against private persons; no question of the liability of municipal corporations was contested by the parties, or alluded to by the court; and neither decision has any tendency to support the libel in the present case. In *The Siren,* a claim against a prize ship for damages from a collision with her while in the possession of the prize crew was sustained against the proceeds of the sale after condemnation, solely because the United States were the actors in the suit to have her condemned. So in *The Davis,* salvage against goods belonging to the United States, and part of the cargo of a private ship, was allowed because the possession of her master was not

the possession of the United States, and the United States could only obtain the goods by claiming them in court. In short, in each case, as Mr. Justice Miller afterwards pointed out, "the Government came into court of its own volition to assert its claim to the property, and could only do so on condition of recognizing the superior rights of others." *Case* v. *Terrell*, (1870) 11 Wall. 199, 201. The opinion in each of the three cases distinctly affirmed the well settled doctrine of our law, that no suit can be maintained in a judicial tribunal against a State, or against its property, without its consent. See also *Cunningham* v. *Macon & Brunswick Railroad*, (1883) 109 U. S. 446, 451; *Stanley* v. *Schwalby*, (1892) 147 U. S. 508, 512, and (1896) 162 U. S. 255, 270; *Belknap* v. *Schild*, (1896) 161 U. S. 10, 16; *Briggs* v. *Lightboats*, (1865) 11 Allen, 156, 179–185. In England, it is equally well settled that no libel in admiralty can be maintained against the Crown, or against a foreign sovereign, or against any property of either, without his consent. See *The Lord Hobart*, (1815) 2 Dodson, 100; *The Athol*, (1842) 1 W. Rob. 374; *The Parlement Belge*, (1880) 5 Prob. D. 191, in which the Court of Appeal, speaking by Lord Justice Brett, (since Lord Esher, M. R.,) reversed the exceptional decision of Sir Robert Phillimore in 4 Prob. D. 147. The decisions that no suit can be maintained against the sovereign without his consent have certainly no tendency to support a suit against a municipal corporation for negligence in exercising powers delegated to it as a political division of the State, or to its officers, for the benefit of the whole public, and not for the benefit of the corporation only.

The cases of *The Blackwall*, (1869) 10 Wall. 1, *The Clarita and The Clara*, (1874) 23 Wall. 1, and *The Connemara*, (1883) 108 U. S. 352, related to the rights and liabilities of private persons engaged in saving, or attempting to save, vessels from imminent danger of destruction by fire; and decided nothing as to the rights or liabilities of municipal corporations or of their firemen. In *The Clarita*, it was a private corporation owning a ferry boat was held liable for negligence while engaged in an attempt to save a vessel from destruction by fire; and *The Blackwall*, *The Clara* and *The Connemara* concerned the allowance of salvage to private salvors for services in putting out a

fire on a vessel. In *The Blackwall*, the court avoided, as unnecessary to the decision, the expression of any opinion upon the question whether members of a fire department could recover salvage for such services. 10 Wall. 12. It was afterwards decided by Mr. Justice Bradley, sitting in the Circuit Court, that they could not, because " the firemen were merely engaged in the line of their duty," and " the attempt to make the performance of this duty a ground of salvage, when it is a ship that takes fire, is against wise policy." *The Mary Frost*, (1876) 2 Woods, 306 ; *The Suliote*, (1880) 4 Woods, 19.

In *The F. C. Latrobe*, (1886) 28 Fed. Rep. 377, in the District of Maryland, and in *Gavagnin* v. *Philadelphia*, (1894) 59 Fed. Rep. 303, and 17 U. S. App. 642, and in *Guthrie* v. *Philadelphia*, (1896) 73 Fed. Rep. 688, in the Eastern District of Pennsylvania, in each of which a libel in admiralty was maintained against a city for a collision with the libellant's vessel of a steamboat maintained by the city for the purpose of clearing its harbor of ice, the steamboat, at the time of the collision, was not engaged in its usual public service, but in a special service for a private benefit; and stress was laid upon that fact in each of the opinions.

The decisions of the Circuit Court of the United States in Massachusetts in *Boston* v. *Crowley*, (1889) 38 Fed. Rep. 202, and of the District Court of the United States in Connecticut, in *Greenwood* v. *Westport*, (1894) 60 Fed. Rep. 560 ; *S. C.*, 63 Connecticut, 587, were only that libels in admiralty *in personam* could be maintained against a city or town for injuries caused to vessels by not keeping open a draw in a bridge. It may also be observed that in *Crowley's* case the decision was not in accord with the earlier decision in *French* v. *Boston*, (1880) 129 Mass. 592, and proceeded upon the assumption (38 Fed. Rep. 204) that the question was one of general municipal or commercial law upon which the courts of the United States were not bound to follow the decisions of the highest courts of the State—an assumption inconsistent with the later judgment of this court in *Detroit* v. *Osborne*, 135 U. S. 492, 498, above cited. In *Greenwood's* case the question was considered to be an open one in the courts of Connecticut; and it has since been decided the

other way by the highest court of the State.     60 Fed. Rep. 569, 575, 576; *Daly v. New Haven*, (1897) 66 Connecticut, 644.

The only instance cited at the bar, in which a libel in admiralty has been maintained in such a case as the present, is that of *Thompson Navigation Co. v. Chicago*, (1897) 79 Fed. Rep. 984, decided by the District Court for the Northern District of Illinois since this suit was commenced, and avowedly a departure from the case of *The Fidelity*, (1878) 9 Benedict, 333, and (1879) 16 Blatchford, 569, in the Southern District of New York, in which it was held by Mr. Justice Blatchford, then District Judge, and by Chief Justice Waite in the Circuit Court on appeal, that a libel *in rem* could not be maintained in admiralty against a steam tug owned by the city of New York, and under the exclusive control of the commissioners of public charities and correction, and employed in the performance of their official duties, for her collision with the libellant's vessel through the negligence of those in charge of the tug.

The duty of the State to protect the property of all from destruction by fire covers vessels in its harbors, as well as buildings within its territory. The authority of the fire department and its members as to both kinds of property is derived from the municipal law, and not from the maritime law.   *Ralli* v. *Troop*, 157 U. S. 386, 419, 420.   All the shipping, foreign and domestic, in the port, is under the same safeguard, and subject to the same risks.   Prompt, decisive and unembarrassed action of the firemen is necessary to the protection of both buildings and vessels from the dangers of a conflagration.   The necessity of allowing a municipal fire-boat to proceed on her way to put out a fire affords a special reason for not allowing her, while so occupied, to be seized on a libel *in rem*.   But all the reasons for not maintaining an action of this kind against the city in a court of common law apply with undiminished force to a libel against the city *in personam* in a court of admiralty.

In any aspect of the case, therefore, we are of opinion that this suit cannot be maintained against the city of New York; not by the local law of New York, because that law, as declared by the Court of Appeals of the State, is against the maintenance of such a suit; not by the maritime law, because according to

the municipal law prevailing throughout this country, as declared by the highest court of every State in which the question has arisen, cities are not liable to such suits, and no authoritative precedent or satisfactory reason has been produced for applying a different rule in a court of admiralty.