## THE ROYAL.

### (District Court, E. D. New York. April 24, 1916.)

NAVIGABLE WATERS ☞20(8)—INJURY TO VESSEL FROM COLLISION WITH BRIDGE —NEGLIGENT OPERATION OF DRAW.

A tug approaching a drawbridge maintained by the city over the Harlem River signaled for the opening of the draw and a following tug with a tow signaled immediately afterward. On receiving an assenting signal from the bridge, both tugs proceeded, and the first passed in safety; but when the second was within the draw it began to close, and before she could escape her tow was struck and injured. When the draw was open the bridgetender could not see up or down the river, and a lookout, usually kept on duty, was not at his post. *Held*, that the absence of such lookout was negligence, which rendered the city liable for the injury; that under the circumstances the tug was not in fault for

assuming the bridge signal was intended for her, as well as the preceding boat, and proceeding accordingly.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. § 96; Dec. Dig. ☞20(8).]

In Admiralty. Suit by Charles W. Peterson against the City of New York, with the tug Royal impleaded. Decree for libelant against the city.

Foley & Martin, of New York City, for libelant.
George P. Nicholson, of New York City, for City of New York.

CHATFIELD, District Judge. In the forenoon of June 6, 1914, at about 10:25, in clear weather, the tugboat Defiance approached from the south the Broadway bridge over the Harlem River. This bridge has a draw 272 feet in length, turning upon a centerpin, which protected a bulkhead, 52 feet from side to side. The iron drum around the centerpin containing the machinery of the draw is 40 feet in diameter, while the total length of the breakwater or pier upon which the draw rests when swung up and down the river, is 328 feet. At the time in question, a strong tide was running up or toward the Hudson river and the Defiance approached upon the Bronx or north side of the channel, also going toward the Hudson river, and making with the tide some 7½ or 8 miles per hour.

The Defiance had a boat alongside and blew three whistles. It appears that the bridge is operated by electricity, which is obtained from the subway system of railroad. One deck of the bridge carries subway trains, while the upper deck carries street traffic. Before the bridge can be opened, signals in the subway have to be set against the subway trains, and then, through an independent set of signals and electric connections, power is furnished from the subway to the bridge mechanism. The bridgetender or engineer is then notified that his machinery is furnished with power, and that he may proceed to open the bridge. He in turn has to set signals indicating that the bridge is ready to open, when the gates are closed, and the draw is swung so that the north or Harlem end moves toward the west, coming to rest upon the centerpin and then turning back. The actual motion of the bridge, passing through an arc of 90 degrees, occupies about 60 seconds and about 8 seconds are occupied in closing or opening the gates, etc. The Defiance blew a three-whistle signal to notify the draw that it wished to pass through. The engineer of the bridge replied by a three-whistle signal, thus indicating that danger signals had been set against the subway trains, that he had received the signal indicating the furnishing of power for the turning of the bridge, and that the bridge would open.

We are not concerned in this case with the situation which would have existed if the bridge had not responded to the signal to open the draw. It will be observed that, from the time of the three-whistle signal by the bridge, trains could not pass in the subway until the bridgetender indicated that the bridge was again closed or at rest, and ceased from making any use of the power, which would then be shut off, so as to safeguard the passage of trains in the subway.

The frequent passage of trains in the subway requires the operation of opening and closing the bridge to be performed as quickly as possible. The bridgetender has the duty imposed upon him of operating the bridge in such a way as to allow any boat attempting to use the open draw a safe passage, and at the same time to avoid undue delay or waiting for any boat that is not close enough to the draw to pass through safely and within a reasonable time. The duty also devolves upon the bridgetender, as in the case of any other drawbridge, not to close the draw in the face of a boat which has by signal, or by actual approach to the open draw, reached a position where it cannot safely remain or maneuver, if the draw be closed.

Upon the occasion in question the Defiance passed through safely, and the captain of the Defiance, after this boat had cleared the upper end of the draw by some 25 feet, and after that end of the draw had started to return to the Bronx abutment, heard alarm whistles and, looking around, saw a tug, the Royal, with a boat alongside, somewhere within the space alongside the center abutment and some 300 feet behind the Defiance.

At that time the engineer upon the drawbridge was shut off from a view through the draw, by the circular iron sides of the structure containing the machinery of the draw. He had an outlook toward the Bronx shore and toward the New York shore, but could not, without leaving his levers, see up or down the river. The assistant (or lookout, on ordinary occasions) was at that time attending to the machinery in another part of the bridge. The engineer testifies that he heard no signal from the Royal, that he knew nothing of her presence until the blowing of the alarm whistles, and that then he attempted to stop the draw, but did not succeed in bringing it to rest until almost in position upon the abutments.

The Royal in the meantime had been unable, under reversed engines, to extricate herself from the draw, and the mast upon the barge alongside of the Royal came in contact with the beams of the draw, lifting it out of that boat and allowing the boats to drift against the side of the bridge. Action was brought by the owner of this boat against the city, and the city has brought in the tug Royal, alleging that it was in fact responsible for the injuries.

The question of responsibility in the case comes down to a dispute as to the position of the Royal at the time when the Defiance blew for the bridge and when the Royal signaled to the bridge that it would follow the Defiance through. The testimony of the captain of the Royal is to the effect that the Defiance, "when she came to the turn," blew three for the bridge, "and, as soon as he stopped, I also blowed three for the bridge, the bridge, immediately after I blowed, opened, the Defiance started ahead, and I followed." As the Royal came alongside of the draw, which was then resting upon the centerpin, the captain of the Royal noticed that the lower end of the bridge was swinging away from him, and that the upper end was closing toward him. He then blew the alarm signals and reversed his engines.

The city has called a witness, who testifies that he was upon the New York shore, and that the Royal was down around the bend in the river, which according to the chart is some 800 or 900 feet away,

when the Defiance whistled and the Royal also whistled and started to catch up with the Defiance, so as to go through the draw at the same time.

The city charges that the Royal was at fault in not indicating her desire to pass through the draw, in such a way and from such a position as to allow the bridge to receive her signals and to answer an acceptance before the Royal put herself in a position from which she could not withdraw.

The city alleges that the Royal, under circumstances which indicated to her captain that the bridge was opening for the Defiance and was not intending to stay open for the Royal, rushed into danger, and is therefore responsible for her own injury. The Royal, on the other hand, charges that the maintenance by the city of a structure from which approaching objects cannot be observed when the drawbridge is open, unless a lookout be maintained, and the failure to have a lookout for the protection of approaching boats, is neglect giving the Royal the right to recover.

Both of these propositions are correct as matters of law. It rested upon the Royal to use reasonable precautions in obtaining the right to pass through the draw before the Royal reached a point where she could not stop if the draw should be closed. This is the ordinary rule of law with respect to the operation of drawbridges, and the Royal certainly would not be relieved from any part of that duty, if she knew in fact that the city was operating a bridge so constructed that the position of the Royal might not be ascertained in time to keep the draw open, or if she knew that the lookout was not attending to his duty.

Under such circumstances, the Royal should insist upon an answer to her own signal to the bridge, and to make sure that she had the attention of the bridge before getting into a position where the tide would carry her against the draw. In the present case the city goes so far as to charge that the Royal did not realize the height of the boat alongside, and that she disregarded the necessity of having the draw opened for her passage. This is not borne out by the testimony, and the Royal evidently navigated, relying upon the whistle which she had blown to the bridge and the assumption that the answer of the bridge to the whistle of the Defiance was intended for the Royal as well, and was an answer to the whistles which she had blown.

The real question of fact, so far as the Royal is concerned, is whether she showed negligence in approaching the bridge, having blown a whistle at a point down close to the bend in the river, and then having hurried after the Defiance, in order to save the time which would be lost in waiting for the bridge to again open after the Defiance had passed through. If the Royal was negligent in so approaching the draw, then she would be partially responsible for the accident; but at the same time it would seem that the city would be liable as well.

The maintenance of a bridge, in such form and with such attendance that the bridge engineer can observe no other boats up or down the river than the one which is directly at the side of the engine house as it turns, and which shuts out from his view any boat coming

around the bend, just as soon as the drawbridge commences to turn, would place upon boats seeking to use the draw, not only the duty of giving proper signals and relying upon an answer from the bridge, but estimating whether or not the draw had turned to a sufficient extent so as to shut off the view of the engineer, and whether the lookouts were performing their duties before the boat could conclude that the draw would be kept open for its passage.

But in this case the Royal cannot be held responsible for the failure of the city to observe an approaching boat, which apparently had given the proper signal to the bridge, whose signal had apparently been answered, and which was in a position where danger might be caused by the closing of the bridge, when that closing followed from complete failure to observe that the boat was in a dangerous position, after the boat had reached a point where it could not extricate itself, and where it was entitled to watchfulness on the part of those operating the bridge, before the draw was closed.

The other questions, viz., whether the Royal was negligent in putting herself in the position where carelessness on the part of the bridge would result in her injury, and in hurrying to pass through the bridge before she had some indication or proof that the bridge saw her as well as the Defiance must also be answered in favor of the Royal. She evidently whistled before the whistle from the bridge that the draw was to open. She may not have been at that time within the direct range of vision of the bridge engineer, but she continued to approach the bridge while the draw was opening, and actually got into the space at the side of the draw before the draw started to close.

It cannot be held that such an action was contributory negligence, or that the Royal should have remained down the river until the bridge opened a second time, for she certainly had the right to rely upon care as to all boats within the zone of danger when the bridge started to close, and she was already within that zone of danger before the bridge gave indications of closing. To hold the Royal responsible for contributory negligence would be to excuse the bridge from all care, except with reference to the particular boat which the bridgetender had in mind when he began to open the draw, and when his vision was shut off by the sides of the engine room. To do this would be to make the Royal responsible for estimating what the bridgetenders had seen and heard instead of what they should see and hear. If a boat gives a signal in time to have it answered, and apparently receives an answer, then it cannot be held responsible for the action of the bridge, if the bridge is negligent on its own part and was really answering the signal of a different boat.

There is no persuasive evidence that the Royal failed to blow a signal to the bridge until after the bridge had answered the signal of the Defiance, or that the Royal attempted to signal to the bridge and then to rush through the draw without answer, after the bridge apparently indicated by its failure to respond to the whistle signal of the Royal that it was going to allow the Royal through. Under the circumstances shown by the testimony, the Royal had reached a position where the mere turning of the draw was the cause of the injury.

The facts indicate that the Royal's signal anticipated the answer of the bridge to the Defiance, and the accident resulted from the inability of the bridge engineer to take into account the actual position of the Royal at the time he began to return the draw to its closed position.

The libelant may have a decree.