## STEEL ALL WELDED BOAT CO. v. CITY OF BOSTON.

### No. 643.

District Court, D. Massachusetts.

Feb. 24, 1937.

Thomas H. Walsh, of Boston, Mass., for libelant.

Frederick W. Mansfield, of Boston, Mass., for respondent.

BREWSTER, District Judge.

This libel is brought to recover for damages to the motor vessel Mary L. Connelly, resulting from a collision between the boat and the Meridian street draw-bridge.

### Statement of Facts.

1. Meridian street bridge spans the Chelsea river from East Boston on the southerly end to Chelsea on the northerly end. The bridge swings upon a central pier, which divides Chelsea river into a northerly and a southerly channel. The southerly channel is the one more frequently used, as it is free from obstructions. In the northerly channel dolphins marked a relatively narrow channel for boats, at least they were there on the day of the collision. The bridge is supported by trestle work above the level of the roadway and carries, along each side, a railing sufficiently high to protect pedestrians. The control house is on one side of the bridge. The structure interferes somewhat with the view of the drawtender over the waters near the bridge, especially those on the side opposite the control house. The bridge is maintained and operated by the City of Boston. By ordinance of the city the draw tender is appointed and controlled by the Commissioner of Public Works, and such a duly appointed draw tender was in charge on the morning of the accident. There were also on duty at the same time two gate tenders.

There is no evidence to indicate that the Regulations of the War Department (Aug. 18, 1894, § 5) relative to maintenance or operation of the bridge over the Chelsea river were not complied with, except that the bridge did not give the answering signals, as required. I find that this failure, however, in no way contributed to the accident.

2. The Mary L. Connelly is a motorboat operated by Diesel engine. She is 54½ feet long, about 9-foot beam, 9½ feet depth and draws 8 feet of water, when loaded. She carried a mast about 18 feet high. On the morning of April 19, 1935, she took on a cargo of fuel oil at the plant of the Hartol Oil Company in Revere, and proceeded down the Chelsea river toward the Meridian street bridge. She was then in charge of one Tracey, who held no license. When about 300 yards from the bridge, Tracey gave a signal for an open bridge. At the same time he saw three tugboats coming up the river, headed for the southerly channel, so he elected to go down through the northerly channel. Before the bridge began to swing open, and when the Mary L. Connelly was about 100 yards away, he gave another

signal. What happened on the Mary Connelly between that time and the collision is not clear, but it may be reasonably inferred that the boat was moving at slow speed and "drifting around" until the bridge had been fully opened for some minutes, when she started at full speed and had proceeded into the slip just as the bridge, in closing, had swung out over the water, striking and breaking the mast. The locking device under the bridge came in contact with the afterhouse before the bridge was brought to a stop. Tracey had paid no attention to the movement of the bridge after it had opened, for he first became aware that it was closing when the mast was hit. He then gave a danger signal, but much too late to avoid the damage that resulted.

3. Respecting the operation of the bridge, I find that when the tugs, coming in the opposite direction, neared the bridge, they blew the required signal. It was heard by one of the gate tenders who notified the draw tender. The gate tender also heard the signal from the Mary Connelly, but the draw tender did not distinguish it, if he heard it, from those from the tugs. He supposed he was opening the draw for the tugs only. He was not aware that the Mary Connelly was in the vicinity. The bridge was opened without undue delay and, due to the fact that one of the tugs was some distance back of the others, and the further fact that the gate tender on the Chelsea side was oiling the casters, the bridge remained in its open position for several minutes. It is inconceivable that the Mary Connelly, only 100 yards away when the bridge began to open, did not have ample time to go through the channel if those in charge had been using due care and diligence. As the bridge was positioned when the signals were given, the control box was on the westerly side, and when it was open would be on the southerly side, so that at all times the draw tender would be on the side of the bridge away from the Mary Connelly and could not readily see a boat low in the water, especially as she came near the center pier. The evidence is that the Mary Connelly when hit was about 15 feet north of the piles along the northerly side of the pier at the easterly end. As the bridge started to close, the gate tender on the Chelsea side, who had finished oiling the blocks on that side, saw that the Mary Connelly was in danger and called to the draw tender to hold the bridge. It came quickly to a stop, but not until after the mast of the Mary Connelly had hit the easterly end of the structure and the afterhouse had been damaged by the mechanism under the bridge floor.

## Conclusions of Law.

Upon the foregoing facts, I have reached the conclusion that the Mary L. Connelly was at fault in these particulars: (1) That she did not proceed with due diligence to go through the draw when it was open, and (2) that the one in charge failed to pay any attention to the movements of the bridge; had he done so, it is reasonable to believe that he could have signaled and laid his course so as to avoid the accident.

While it is not conclusive, it is some evidence of negligence that the boat was in charge of one who held no license at the time. Richards v. City of Boston (D.C.) 43 F.(2d) 448.

The question remains, whether the bridge tender was also negligent. Apparently the admiralty law imposes a rather heavy burden upon those operating a drawbridge to make sure that no vessel is about to enter the draw when the bridge is closing, and the fact that the structure interfered with the draw tender's view of the stream seems not to have relieved the draw tender of the charge of negligence. Greenwood v. Town of Westport (D.C.) 60 F. 560; The Royal (D.C.) 233 F. 296; Wright & Cobb Lighterage Co. v. Snare & Triest Co. (C.C.A.) 239 F. 482; City of Boston v. Crowley (C.C.) 38 F. 202; Richards v. City of Boston, supra.

Respecting the relative degrees of negligence, it is my opinion that there is little difference between that of the draw tender and that of the master of the Mary L. Connelly, and that the damages should be equally borne by the City and by the boat.

The city has invoked the doctrine obtaining in the state courts, to the effect that a municipality cannot be held to answer in damages for the negligence of its agents or officers. It is well established that in the admiralty court this doctrine cannot be invoked. Workman v. New York City, 179 U.S. 552, 21 S.Ct. 212, 45 L.Ed. 314; Chelentis v. Luckenbach S. S. Co., 247 U.S. 372, 38 S.Ct. 501, 62 L.Ed. 1171; The Chusan, 5 Fed.Cas. p. 680, No. 2,717.

The rule obtaining in admiralty is that a municipality can be held liable for the negligent operation of a drawbridge over navigable streams. Dorrington v. City of Detroit (C.C.A.) 223 F. 232; City of Boston v. Crowley, supra; Greenwood v. Town of Westport, supra; O'Keefe v. Staples Coal Co. (D.C.) 201 F. 131.

A decree may be entered awarding the libelant one-half of the damages sustained.