(No. 483█ 

FEDERAL BARGE LINES, INC., Claimant, vs. STATE OF ILLINOIS, Respondent.

*Opinion filed November 10, 1959.*

JOHN F. GILLESPIE AND BELNAP, McAULIFFE AND SPENCER, Attorneys for Claimant.

LATHAM CASTLE, Attorney General; LESTER SLOTT, Assistant Attorney General, for Respondent.

TOLSON, C. J.

Claimant, Federal Barge Lines, Inc., seeks an award for damages to the M/V Huck Finn in the amount of $14,098.81 by reason of a collision with the Brandon Road Bridge, which was alleged to have been negligently lowered by an employee of respondent.

Respondent did not offer any evidence in the case other than a Departmental Report, and predicates its defense on the failure of the M/V Huck Finn to sound a long blast of the whistle, which is the signal to open the bridge, and is required by Rule No. 7 of the Federal Rules and Regulations governing the operation of draw bridges crossing the Mississippi River and its navigable tributaries.

There is no dispute as to the facts, which may be summarized as follows:

At about 2:20 A.M. on the morning of July 19, 1956,

a collision occurred between a towboat, the M/V Huck Finn, which was owned and operated by claimant, and the Brandon Road bridge, a highway bridge, owned and operated by respondent, which spans the Des Plaines River, a navigable waterway of the United States.

The locale of the collision is shown on claimant's exhibit No. 1, which is a copy, original size, of chart No. 62 of the navigation charts of the Illinois Waterway from the Mississippi River at Grafton, Illinois, to Lake Michigan at Chicago and Calumet Harbors, prepared by the Corps of Engineers, U.S. Army. As indicated by the exhibit, the bridge crosses the waterway about 150 feet below the lower gates of Brandon Road lock. However, it is closer to the lock gates at its north end than at its south end, since it crosses the waterway at an angle. The bridge is a double-leaf bascule bridge, having a horizontal clearance of 110 feet, and a vertical clearance closed of 15.4 feet above pool stage.

At the time of the collision the M/V Huck Finn was proceeding downstream, and was running light, that is, without barges. She had just passed through the Brandon Road lock, having locked through with the M/V Hugh C. Blaske and its tow of five barges, which she was following out of the lock, when the bridge, without any warning or signal, was lowered in front of her. She was unable to kill her headway, and she collided with the bridge.

Prior to the time of the accident, when the pilot came on watch it was raining, but the rain stopped about 1:00 A.M., and it was hazy at the time of the collision. All necessary navigation lights were burning, the red and green lights on the pilot house, two white lights above the pilot house, and one stern mast light to indicate that the M/V Huck Finn was running without barges. In addi-

tion, amber guard lights running entirely around the main deck were turned on. The 10,000 candle-power searchlight was on when the M/V Huck Finn entered the lock. It was turned off in the lock. Then it was turned on again as the M/V Huck Finn left the lock, and remained on until the time of the collision.

The M/V Blaske was southbound with a tow of five barges, and the M/V Huck Finn requested permission, which was granted, to lock down with the M/V Blaske. The M/V Blaske and its tow entered the lock first. It moored on the left descending wall. Its tow was made up of three barges wide across the head, and two wide back next to the boat. All of the barges were ahead of the tow-boat. The extra barge on the head end was on the starboard side. Upon entering the lock the M/V Huck Finn tied off on the face barge of the M/V Blaske tow, that is, the barge directly in front of the towboat. The head line from the M/V Huck Finn ran to the face barge on the M/V Blaske tow, and the stern line from the M/V Huck Finn ran to the M/V Blaske.

After the M/V Huck Finn entered the lock and moored alongside the M/V Blaske, her engines were stopped until the lock chamber was emptied. As soon as the lock chamber was emptied, and the lower gates were opened, the lock man signaled permission to leave the lock by blowing a short whistle. This is the signal prescribed by Army regulations for permission to leave the lock (33 C.F.R. 207.300 (e) (1) (iii) (a) ).

The lock man then blew a long blast on the whistle for the bridge to open. There is no rule prescribing such a signal to be given by a lock. The prescribed signal to be given by an approaching vessel for a bridge to open is one long blast of the whistle (33 C.F.R. 303.555(d)(1)-(i) ). However, the testimony of the pilot of the M/V

Huck Finn was that "they (the lock personnel) always blow whistles to open the bridge."

After the lower gates were open, the M/V Blaske blew a short whistle as a signal to turn the lines loose from the lock wall. She then blew a long whistle for the bridge to open, and the bridge answered with a siren. The bridge was still down when the lower lock gates were opened. With the bridge down and the lower gates opened the pilot of the M/V Huck Finn could see the bridge control house.

As soon as the M/V Blaske started moving, the M/V Huck Finn immediately blew a short whistle to signal the mate to turn loose from the M/V Blaske. *The M/V Huck Finn, independently, did not blow a long whistle for the bridge to open.* Just after the M/V Huck Finn had cleared the lower lock gates, the pilot noticed that the bridge was coming down. He estimated that, to the best of his judgment he was about a hundred feet away from the bridge when he first noticed that it was coming down. There is a red light on the end of each leaf of the bridge. At no time did the color of these lights change, and no signal was ever given by the bridge, either visual or sound, that the bridge was coming down.

As soon as the pilot noticed that the bridge was descending, he immediately blew the danger signal consisting of four short blasts of the whistle. He stopped the engines and reversed them. He estimated his speed at about one mile an hour. There was practically no current at the time. He estimated that it took about 15 to 20 seconds to reverse the engines. He kept backing the engines, but had to leave the pilot house, and, as he went around the corner of the pilot house, he was cut by a piece of glass. He was unable to kill the headway on the boat, however, and the right descending leaf of the

bridge (that is, the right leaf of the bridge looking at the bridge headed downstream) struck the starboard corner of the pilot house. The M/V Huck Finn stopped directly under the bridge. The airline controls in the pilot house were broken by the collision, and the engines were still backing, so the pilot had to go to the engine room to get the engineers to stop the engines.

During all this time, after the M/V Huck Finn started leaving the lock, its 10,000 candle-power searchlight was shining down the right descending wall of the lock directly under the bridge.

The damages, which the M/V Huck Finn incurred as a result of the collision, were repaired by the St. Louis Shipbuilding & Steel Co., the parent corporation of claimant. The St. Louis Shipbuilding & Steel Co., which is the largest shipyard on the inland waterway system in volume of business, and which repairs and constructs vessels for other companies as well as for Federal, performed the repair work in this instance under a contract with Federal, based on its published rate schedule, which is, in turn, based on time and material charges.

When the collision first occurred, the St. Louis Shipbuilding & Steel Co. was notified to send a man up to the scene of the accident to make a survey so that the necessary materials for the repairs could be gotten together. The St. Louis Shipbuilding & Steel Co. did not have all the necessary equipment to make final repairs, so temporary repairs were made to the M/V Huck Finn on July 21 through July 24, on which date the M/V Huck Finn went back into service. On August 22. 1956, the M/V Huck Finn again arrived back at the shipyard for permanent repairs, which were completed on September 8, 1956, at which time the M/V Huck Finn departed. The permanent repairs consisted of putting the pilot house

back in its original condition. This included installing necessary navigating equipment, whistle, light, air horn, two searchlights, radar, radio, engine controls, replacing damaged handrailing and flying bridge on each side of the pilot house, and completely rewiring it.

Invoices for the work performed were rendered claimant by the St. Louis Shipbuilding & Steel Co., and were paid. In addition, invoices were rendered to claimant by R.C.A. Communications, Inc., R.C.A. Service Company, Inc., and Southwestern Bell Telephone Company for material and services furnished by those companies, which invoices were paid.

The items of repair and the cost thereof are as follows (claimant's exhibits Nos. 6, 7 and 8):

1. Repair pilot house ................$10,935.77
2. Repair radio equipment ............ 17.98
3. Renew handrailing on starboard side of upper deck house and around pilot house bridge ..................... 770.53
4. Re-install covers over steering gear.. 65.21
5. Replace and install public address system ........................... 201.26
6. Temporary repairs ............... 975.79
7. Repair radar equipment ........... 239.18
8. Repair mobile telephone ........... 76.50
9. Install temporary controls on searchlights, port and starboard ........... 648.07
10. Additional radar parts required for installation ...................... 168.52

$14,098.81

This Court has had several cases, similar to the one at bar, the most recent of which is reported in 22 C.C.R.

659 (*J. E. Vickers, Et Al* vs. *State of Illinois*). In this case, the Court adopted the rule in *Clement* vs. *Metropolitan West Side El Ry. Co.*, 123 Fed. 271:

"A bridge spanning a navigable river is an obstruction to navigation tolerated because of necessity and convenience to commerce upon land. Such a structure must be so maintained and operated that navigation may not be impeded more than is absolutely necessary, the right of navigation being paramount. It is incumbent upon the owner that the bridge be so constructed that it may be readily opened to admit the passage of craft, and maintained in suitable condition thereto. It is also his duty to place in charge those who are competent to operate the bridge, to watch for signals, and to open the bridge for the passage of vessels, and for the performance of such delegated duty he is responsible. It is also his duty to equip the bridge with proper lights giving warning of the position of the bridge and of its opening and closing."

The Vickers' case cites the principle of law governing the use of navigable streams by owners and operators of vessels and bridges, and this Court has determined that it is bound by the Federal regulations and decisions under the Federal maritime law.

With this background, our first inquiry is directed to the charge that the proximate cause of the collision was the fault on the part of the bridge tender in failing to exercise reasonable care to see that the draw was clear before closing the bridge. The facts would seem to support this charge, for the evidence discloses that the area to be viewed by the bridge tender is but 150 feet from the bridge to the lower end of the lock. The M/V Huck Finn was ablaze with light, and, in addition thereto, a 10,000 candlepower searchlight was shining on the right wall. The only conclusion that can be reached is that the bridge tender was negligent in not viewing the area before he commenced to lower the bridge.

As stated by the court in *The Royal*, 233 F. 296, 298 (E.D.N.Y., 1916):

"The duty also devolves upon the bridge tender, as in the case of any other draw bridge, not to close the draw in the face of a boat, which has

by signal or by actual approach to the open draw, reached a position where it cannot safely remain or maneuver, if the draw be closed."

Respondent argues that claimant is not entitled to an award, as it did not comply with Paragraph No. 7 of the Federal Rules and Regulations governing the operation of draw bridges crossing the Mississippi River and its navigable tributaries. The rule is set forth as follows:

· "(7) When vessels are approaching a bridge or a draw from the same direction, each vessel shall signal independently for the opening of the draw, and shall be navigated in accordance with the pilot rule applicable to the waterway governing such vessels."

The facts disclose that the lock tender blew a long whistle, which was for the purpose of directing the bridge tender to open the bridge. Claimant testified that such was a common practice at this particular bridge. In addition thereto, the M/V Blaske blew a long whistle. However, the fact remains that the M/V Huck Finn did not blow a long whistle, and was, therefore, at fault for not complying with Rule No. 7 mentioned above.

Thus the case reaches an impasse. Claimant argues that, if the bridge tender had looked, he could not have failed to see the M/V Huck Finn, as it was elaborately lighted. Respondent argues that, if the M/V Huck Finn had blown a long whistle, the bridge tender would have been fully aware of the fact that two vessels were in the area, both seeking to pass under the bridge.

The Court believes and so finds that the failure to blow the long whistle, as required by regulation, was a material omission of duty on the part of claimant, and one that would be construed as contributory negligence so as to bar a recovery.

Claimant, recognizing this defense, has finally urged that, if the Court finds contributory negligence on the

part of the M/V Huck Finn, it should follow the admiralty principles of maritime tort known as Both-to-Blame Rule. Under Federal maritime law, where two vessels come into collision and both are guilty of fault, the damages are divided equally between them, even though there is a disparity of fault between the vessels. *Gilmore and Black, The Law of Admiralty* (1957), page 402; *Intagliata* vs. *Shipowners and Merchants Towboat Co.,* 159 P. (2d) 1, 5 (Calif., 1945). This rule also applies to a collision between a bridge and a vessel. *Steel All Welded Boat Co.* vs. *City of Boston,* 18 F. Supp. 421, 423 (Mass., 1937). This principle is also set forth in Vol. 45 of *Corpus Juris* in the chapter on Navigable Waters. Sec. 80—Contributory negligence, ''where both the bridge owner and those in charge of the vessel are negligent, the practice in the Federal Court is to divide the damages''. *Great Lakes Towing Co.* vs. *Masaba S.S. Co.,* 237 Fed. 577; *Smith* vs. *Shakopee,* 103 Fed. 240.

Respondent has not introduced any evidence as to damages to the bridge, and it would appear from the briefs that the only damage was to the paint on the bridge. The record discloses that claimant suffered damages in the amount of $14,098.81. Applying this rule to the case, claimant would, therefore, be entitled to $7,049.40.

From the evidence in this case, the Court finds that both claimant and respondent were guilty of negligence, and, upon the application of the Both-to-Blame Rule under maritime law, claimant is entitled to an award of $7,049.40.

We, therefore, allow the claim of Federal Barge Lines, Inc., in the amount of $7,049.40.