557 F.2d 1030
 11 ERC 1197
 William A. MOORE et al., Appellants,
v.
HAMPTON ROADS SANITATION DISTRICT COMMISSION and City of
Newport News, Appellees.
William A. MOORE et al., Appellees,
v.
HAMPTON ROADS SANITATION DISTRICT COMMISSION, Appellant,
and
City of Newport News, Defendant.
William A. MOORE et al., Appellees,
v.
The CITY OF NEWPORT NEWS, Appellants,
and
Hampton Roads Sanitation District Commission, Defendant.
 Nos. 75-1576 to 75-1578.
 United States Court of Appeals,
Fourth Circuit.
 Argued Dec. 5, 1975.
Decided Oct. 7, 1976.
Reargued En Banc March 15, 1977.
On Rehearing En Banc July 13, 1977.
 
 William Mills Krieger, Newport News, Va. (Edward J. Passarelli, Richard Cornelius, Newport News, Va., C. Jackson Simmons, White Stone, Va., and James S. Insley, Poquoson, Va., Alfred Pelaez, Pittsburgh, Pa., Duquesne University School of Law, on brief), for appellants in No. 75-1576 and appellees in Nos. 75-1577 and 75-1578.
 Herbert V. Kelly, Newport News, Va. (E. D. David, Newport News, Va., W. M. Martin, III, Hampton, Va., Jones, Blechman, Woltz & Kelly, Newport News, Va., on brief), for appellees in Nos. 75-1576 and appellants in Nos. 75-1577 and 75-1578.
 Before CRAVEN, Circuit Judge, FIELD, Senior Circuit Judge, and THOMSEN, Senior District Judge.*
 THOMSEN, Senior District Judge.
 Claiming jurisdiction under 28 U.S.C. 1331 (federal question jurisdiction) and 28 U.S.C. 1333 (admiralty and maritime jurisdiction), plaintiffs' complaint alleged that the value of oyster beds in the Warwick River leased to them by the Commonwealth of Virginia has been destroyed as a result of improper operation of a sewage disposal system by defendants, City of Newport News (City) and Hampton Roads Sanitation District Commission (Commission). From a judgment entered in favor of defendants after trial, plaintiffs have appealed.[1] Plaintiffs base their claims against the City on alleged negligence, nuisance and taking of their property without just compensation; they base their claims against the Commission only on an alleged taking.
 Leases of underwater beds for cultivation and harvesting of oysters are granted by the Commonwealth for a term of 20 years at an annual rental of $1.50 per acre or fraction thereof, renewable by the lessee after each term, and are treated as chattels real under Virginia law. Va.Ann.Code, 1973 Repl.Vol., § 28.1-109(12).
 The Warwick is a small river which empties into the James a short distance northwest of Hampton Roads. The few miles with which we are concerned, in which the oyster beds leased to plaintiffs are located, lie between the lower part of Fort Eustis and the City of Newport News and are navigable and tidal. The State Health Commissioner has closed and reopened the Warwick River or portions thereof to direct marketing of oysters a number of times since 1941.
 The City has for many years operated pumping stations which pump sewage to sewage plants operated by the Commission. On several occasions these pumping stations have overflowed into the Warwick River. In 1962 the State Health Commissioner prohibited the harvesting of oysters in the entire river for a short period; that closure is not the basis of any claim in this case. By 1966 portions of the river had been released from that prohibition; however, in 1966 one or more pumping stations overflowed and the State Health Commissioner again closed, due to the high coliform counts, the northern portion of the river in which the beds of several plaintiffs were located. In 1972 there were additional pumping station overflows and the central portion of the river, in which the beds of some of the plaintiffs are located, was closed. The statute under which the closures were made permits transplanting of oysters from closed areas into approved areas if a special permit is obtained. Va.Ann.Code, 1973 Repl.Vol., § 28.1-179. Some of the plaintiffs took advantage of this provision, but the evidence indicates that the results were not satisfactory.
 During all material times the Sanitation Commission has operated sewage treatment plants in the area. Since 1967 the Commission has operated the James River Sewage Treatment Plant, which discharges treated sewage into the water at the mouth of the Warwick. In that year the State Health Commissioner closed for the direct marketing of oysters and other shell fish (in accordance with Food and Drug Administration requirements) a buffer zone around the outfall opening.[2]
 The case came on for trial before a jury on issues of liability, issues of damages being reserved. At the conclusion of plaintiffs' evidence the district judge directed a verdict in favor of defendant Commission, ruling that no case against it had been proved on any ground.[3] At the conclusion of all the evidence, the judge submitted to the jury three "inquiries", which the jury answered to the effect that: (1) the high coliform count in the Warwick River which was the reason for the 1966 and 1972 closures was proximately caused by the maintenance and operation of the sewer system of the City; (2) the City was guilty of negligence in the operation and maintenance of its sewer system as the same affected the Warwick River; and (3) such negligence was a proximate cause of conditions requiring the closure of the Warwick River.
 The City thereafter filed a motion for judgment n. o. v. which the district judge granted on the grounds that the action against the City is barred (1) by the doctrine of sovereign immunity, and (2) by the failure of the plaintiffs to give the City the 60-day statutory notice of their claims provided for in Va.Ann.Code, 1957 Repl.Vol., § 8-653, as it read before the 1973 amendment thereto.[4] Plaintiffs' appeal challenges both of these rulings, as well as the district court's ruling that there was no exercise of eminent domain by the Commission. Before resolving these questions, we will discuss the issue raised by defendants' cross-appeals (see n. 1, above).
 The City and the Commission challenge the ruling of the district court that there is no longer an unqualified public right to discharge sewage into tidal streams. The Commission argues that it has not been shown to have violated any provision of Virginia law governing water pollution, and therefore the closing of oyster grounds by the State Health Commissioner due to a pollution hazard was a risk to which the lessees were subject when they took their leases. The City argues that occasional discharges of untreated sewage into the Warwick River do not violate the legislative policy against pollution, and that the oystermen took their leases subject to the risk of such occasional discharges.
 The common law right of the public to dump sewage in tidal streams was recognized in a line of cases applying Virginia law decided during the period 1916 to 1939. Hampton v. Watson, 119 Va. 95, 89 S.E. 81 (1916); Darling v. Newport News, 123 Va. 14, 96 S.E. 307 (1918), aff'd, 249 U.S. 540, 39 S.Ct. 371, 63 L.Ed. 759 (1919); Commonwealth ex rel. Atty. Gen. v. Newport News, 158 Va. 521, 164 S.E. 689 (1932); DuPont Rayon Co., Inc. v. Richmond Industries, Inc., 85 F.2d 981 (4 Cir. 1936); Old Dominion Land Co. v. Warwick County, 172 Va. 160, 200 S.E. 619 (1939). In Darling, the Supreme Court, speaking through Justice Holmes, agreed with the Virginia court that "when land is let under the water of Hampton Roads, even though let for oyster beds, the lessee must be held to take the risk of the pollution of the water". 249 U.S. at 543, 39 S.Ct. at 372. The Court held that the grant was subject to the right of the State to authorize the City of Newport News to discharge its sewage into the Roads, and that the consequent pollution of the plaintiff's oysters was neither a taking of his property without due process nor an impairment of his contract rights.
 Since 1939, however, Virginia has imposed ever-stronger controls on the discharge of sewage into state waters. A Virginia statute now prohibits the discharge of raw sewage into such waters. Va.Ann.Code, 1973 Repl.Vol., § 62.1-44.5. We conclude that whether or not the discharges of raw sewage by the City can be characterized as occasional, they are not now protected by the public policy of the State, and plaintiffs' rights to cultivate oysters are not subject to a right of the City to violate state law.[5]
 The Commission, however, has not been shown to have violated any statutory or regulatory provision. The public right to discharge sewage into the Warwick has been qualified by the legislature only to the extent provided by the pollution control statutes. The Commission, in exercising its statutory right to discharge treated sewage into the Warwick, abridged no rights of the plaintiffs, who took their leases subject to the risk of closure due to lawful discharges.
 Because we agree with the district judge that there was no evidence sufficient to prove a case against the Commission on grounds of negligence, nuisance or a taking by the Commission, the judgment in its favor must be affirmed, whether Virginia law or admiralty principles should be applied.[6] The case against the City, however, requires us to consider whether its liability on grounds of negligence, nuisance and eminent domain is controlled by Virginia law, maritime law or other federal law.
 The Warwick River in the area of the beds involved in this case is a navigable stream, subject to the ebb and flow of the tides. Harvesting oysters and clams, like fishing, is a traditional maritime activity; the cultivation of oysters is so closely related to the harvesting of oysters that interference with cultivation which impairs harvesting also meets the situs and nexus tests established by Executive Jet Aviation v. Cleveland, 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972), and comes within the admiralty and maritime jurisdiction. Union Oil Co. v. Oppen, 501 F.2d 558, 560-63 (9 Cir. 1974); Potomac River Ass'n Inc. v. Lundeberg Md. Sea. Sch., Inc., 402 F.Supp. 344, 358 (D.Md.1975); Burgess v. M/V Tamano, 370 F.Supp. 247 (D.Me.1973); State Dept. of Fish and Game v. S. S. Bournemouth, 307 F.Supp. 922 (C.D.Cal.1969) (decided prior to Executive Jet ).[7]
 Whether in a particular case an admiralty court will adopt state law or fashion its own principles for application depends upon whether the adoption of state law would impair the uniformity of admiralty law, and whether there is some admiralty principle which preempts state law. Workman v. New York City, 179 U.S. 552, 21 S.Ct. 212, 45 L.Ed. 314 (1900); St. Hilaire Moye v. Henderson, 496 F.2d 973 (8 Cir. 1974); In re M/T Alva Cape, 405 F.2d 962 (2 Cir. 1969).
 All of the parties in this case are Virginians; there is no such interstate problem as was involved in Illinois v. Milwaukee, 406 U.S. 91, 92 S.Ct. 1385, 31 L.Ed.2d 712 (1972), and Texas v. Pankey, 441 F.2d 236 (10 Cir. 1971). Cf. Committee for the Consideration of the Jones Falls Sewage System v. Train, 539 F.2d 1006 (4 Cir. 1976). The absence of any interstate factor reduces but does not eliminate the importance of the uniformity element in the decision.
 Virginia law controls the construction of the Virginia statutes and the nature and extent of the rights which plaintiffs acquired under their leases. The problem is whether Virginia law should control (1) the question whether the City is immune from liability in such a suit as this and (2) the applicability to this case of the requirement of notice contained in § 8-653 of the Virginia Code, the two points upon which the district judge based his decision to enter a judgment n. o. v. in favor of the City.
 Under Virginia law a City is immune from liability for negligence in performing governmental functions, but not for negligence in performing proprietary functions. Fenon v. City of Norfolk, 203 Va. 551, 125 S.E.2d 808 (1962). However, the Virginia law with respect to which activities of a municipal corporation are governmental and which are proprietary is far from clear. Taylor v. City of Newport News, 214 Va. 9, 197 S.E.2d 209 (1973) (collection of garbage held to be a governmental activity); Fenon v. City of Norfolk, supra (removal of fallen trees from streets after a hurricane is governmental activity); City of Norfolk v. Hall, 175 Va. 545, 9 S.E.2d 356 (1940) (maintenance of public streets and sidewalks is proprietary activity); Hoggard v. City of Richmond, 172 Va. 145, 200 S.E. 610 (1939) (operation of swimming pool is proprietary activity); Ashbury v. City of Norfolk, 152 Va. 278, 147 S.E. 223 (1929) (removal of garbage by municipality is governmental activity).
 On the other hand, the weight of admiralty authority which has been cited or found is in line with those state decisions which have increasingly repudiated or narrowed the immunity of municipal corporations when performing governmental functions. Workman v. New York City, 179 U.S. 552, 21 S.Ct. 212, 45 L.Ed. 314 (1900); In re M/T Alva Cape, 405 F.2d 962 (2 Cir. 1969); Principe Compania Naviera, S. A. v. Board of Commissioners, 333 F.Supp. 353 (E.D.La.1971); Kelley Island Lime & Transport Co. v. City of Cleveland, 47 F.Supp. 533 (N.D.Ohio 1942); 1 Benedict on Admiralty, 7th Ed. (1974), § 112, at 7-37 et seq. Cf. J. Ray McDermott & Co., Inc. v. Department of Highways, State of La., 267 F.2d 317 (5 Cir. 1959); Broward County, Fla. v. Wickman, 195 F.2d 614 (5 Cir. 1952). For a full review of state cases, see Long v. City of Weirton, 214 S.E.2d 832 (W.Va.1975).
 We have grave doubts whether, in the light of the most recent Virginia cases, the Virginia court would extend immunity to the City in such a case as this. It is not necessary to decide that question, because we conclude that maritime law principles should be applied, and that, applying those principles, the City is not immune from liability for such negligence as has been shown in this case.
 There remains the question whether plaintiffs' claims are barred by their failure to give notice to the City within 60 days after the respective causes of action accrued. Here again, we conclude that maritime law principles should control and that the issue should be decided by applying the doctrine of laches rather than by applying the 60 day notice statute.[8] Since all facts with respect to laches may not have been fully developed in the district court, evidence and argument with respect thereto should be considered by the district judge on remand.
 The district judge concluded that the City was not maintaining a nuisance. Even if that conclusion were not correct, plaintiffs would not be entitled to an injunction against the City's operation of its sewage system, and the damages, if any, to which a plaintiff might be entitled would not exceed the damages recoverable for negligence.
 The judgment in favor of the defendant Commission is affirmed.
 The judgment in favor of the defendant City is reversed and the case is remanded for further proceedings consistent with this opinion.
 Affirmed in part, reversed in part, and remanded.
 
 
 1
 FIELD, Senior Circuit Judge (concurring in part; dissenting in part).
 
 
 2
 While I agree with much that is in the majority opinion, I cannot concur with my brothers in their conclusion that the destruction of the plaintiffs' oyster beds was a maritime tort falling within the admiralty jurisdiction of the court. My reading of Executive Jet Aviation, Inc. v. City of Cleveland, 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972), indicates that the maritime nexus requisite for admiralty jurisdiction is a "relationship between the tort and traditional maritime activities, involving navigation or commerce on navigable waters." (Emphasis Added) Id., at 256, 93 S.Ct. at 498. We recognized the restrictive nature of such a nexus in declining admiralty jurisdiction of the aquatic accidents in Crosson v. Vance, 484 F.2d 840 (4 Cir. 1973), and Onley v. South Carolina Electric & Gas Co., 488 F.2d 758 (4 Cir. 1973), and in my opinion the cultivation of oysters is not a traditional form of maritime commerce and navigation which would support admiralty jurisdiction in this case. I think my conclusion on this point is consonant with the jurisdictional philosophy of Executive Jet but it does not rest on that alone for it is based upon decisions of the Court extending back well into the last century.
 
 
 3
 In Smith v. Maryland, 18 How. 71, 59 U.S. 71, 15 L.Ed. 269 (1855), a Maryland statute regulating the harvesting of oysters in its waters was challenged on the grounds that it was repugnant to the commerce clause of the Constitution and conflicted with the admiralty jurisdiction of the United States. In upholding the statute, the Court noted that "(w)hatever soil below low-water mark is the subject of exclusive propriety and ownership, belongs to the State on whose maritime border, and within whose territory it lies, subject to any lawful grants of that soil by the State, * * *." Id., at 74. On the question of admiralty jurisdiction the Court said:
 
 
 4
 "But we consider it to have been settled by this court in United States v. Bevans, 3 Wheat. 386, that this clause in the constitution did not affect the jurisdiction, nor the legislative power of the States, over so much of their territory as lies below high-water mark, save that they parted with the power so to legislate as to conflict with the admiralty jurisdiction or laws of the United States. As this law conflicts neither with the admiralty jurisdiction of any court of the United States conferred by congress, nor with any law of congress whatever, we are of opinion it is not repugnant to this clause of the constitution." Id., at 76.
 
 
 5
 Some years later in McCready v. Virginia, 4 Otto, 391, 94 U.S. 391, 24 L.Ed. 248 (1876), the Court had occasion to consider the authority of Virginia to regulate oyster cultivation in its tidal rivers. Again recognizing that each state owns the beds of all tidal waters within its jurisdiction, the Court stated:
 
 
 6
 "The title thus held is subject to the paramount right of navigation, the regulation of which, in respect to foreign and inter-state commerce, has been granted to the United States. There has been, however, no such grant of power over the fisheries. These remain under the exclusive control of the State, * * *." Id., at 394-395.
 
 
 7
 Concluding that the Virginia statute did not violate the commerce clause, the Court observed that "(t)here is here no question of transportation or exchange of commodities, but only of cultivation and production." Id., at 396. The jurisdictional principles of Smith and McCready were recognized and reaffirmed in Manchester v. Massachusetts, 139 U.S. 240, 11 S.Ct. 559, 35 L.Ed. 159 (1891).
 
 
 8
 Additionally, the authority of the states over shellfish cultivation was specifically recognized by the Congress in the Submerged Lands Act of 1953, 43 U.S.C. § 1301, et seq.[9] The construction and application of this legislation has been consistent with the venerable decisions upon which I rely, and in Corsa v. Tawes, 149 F.Supp. 771 (D.Md.1957), aff'd 355 U.S. 37, 78 S.Ct. 116, 2 L.Ed.2d 70, Judge Sobeloff discerned the legislative purpose as follows:
 
 
 9
 "Congress has not sought to impose uniformity, but has been content to leave the matter to local authority and has recently made this intention explicit in the Submerged Lands Act of 1953." Id., at 773.
 
 
 10
 While it is true the Act provides that nothing in it shall affect the constitutional rights of the United States to regulate or improve navigation or to provide for flood control or the production of power,[10] none of these rights so reserved have any operative bearing upon the case before us.
 
 
 11
 In the light of this legislation and the decisions of the Court, I think it is clear that the cultivation of oysters in the Warwick River was a purely local activity subject to the laws and jurisdiction of the State of Virginia, and that the City's negligent intrusion upon the plaintiffs' oyster beds was not a maritime tort.[11] Under these circumstances, the plaintiffs do not fall within the admiralty exception to the statutory notice requirement, and their failure to comply therewith barred their cause of action against the City.
 
 On Petition for Rehearing En Banc
 
 12
 Before HAYNSWORTH, Chief Judge, WINTER, CRAVEN,* BUTZNER and RUSSELL, Circuit Judges; FIELD, Senior Circuit Judge, WIDENER and HALL, Circuit Judges, sitting en banc.
 
 FIELD, Senior Circuit Judge:
 
 13
 The plaintiffs filed this action charging that their oyster beds leased to them by the Commonwealth of Virginia had been destroyed as the result of the improper operation of a sewage disposal system by the defendants, City of Newport News (City) and Hampton Roads Sanitation Commission (Commission). Jurisdiction was asserted under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1333 (admiralty and maritime jurisdiction). The district court entered final judgment in favor of the defendants and the plaintiffs have appealed.
 
 
 14
 At the close of the plaintiffs' evidence the district court granted the Commission's motion for a directed verdict upon the ground that there was no evidence of negligence or other conduct on its part which would give rise to any liability. The trial continued with respect to the City and the jury found it guilty of actionable negligence. Despite the jury's finding, the court granted the City's motion for judgment n.o.v., concluding that the doctrine of sovereign immunity relieved it from liability from any negligent conduct. Alternatively, the court found that the failure of the plaintiffs to give the sixty day statutory notice of their claims as required by Section 8-653, Va.Ann.Code, 1957 Repl.Vol.,[1] barred them from recovery. Upon appeal the plaintiffs challenged the conclusion of the district court upon both of these issues.
 
 
 15
 When this appeal was initially heard a majority of the panel concluded that this case fell within the admiralty and maritime jurisdiction of the court, and that under the weight of admiralty authority neither the Virginia doctrine of sovereign immunity nor the statutory notice requirement would bar the plaintiffs from recovery.[2] Rehearing en banc was ordered for consideration of the admiralty jurisdiction issue.
 
 
 16
 In finding that there was admiralty jurisdiction the panel majority observed that, like fishing, the harvesting of oysters is a traditionally maritime activity, and that the cultivation of oysters is so closely related to the harvesting that any interference therewith meets the situs and nexus test of Executive Jet Aviation v. Cleveland, 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972). We are unable to agree, however, that the present case should be viewed in the perspective of the entire spectrum of the oystering industry. Rather, in our opinion, the interests of the plaintiffs are purely local in their nature, and any alleged impairment thereof falls within the jurisdiction of the state and not the admiralty jurisdiction of the federal courts.
 
 
 17
 As heretofore stated, the plaintiffs' property rights in the oyster beds were derived by leases from the State of Virginia. Recognition of the sovereignty and title of the states to lands underlying navigable waters within their boundaries goes back to the early days of the Republic. Pollard's Lessee v. Hagan, 44 U.S. (3 How.) 212, 11 L.Ed. 565 (1845). The title of the state to such land stems from the Constitution itself, and the nature of such ownership was stated in Weber v. Harbor Commissioners, 85 U.S. (18 Wall.) 57, 65-66, 21 L.Ed. 798 (1873):
 
 
 18
 "Upon the admission of California into the Union upon equal footing with the original States, absolute property in, and dominion and sovereignty over, all soils under the tidewaters within her limits passed to the State, with the consequent right to dispose of the title to any part of said soils in such manner as she might deem proper, subject only to the paramount right of navigation over the waters * * *." (Emphasis added.)
 
 
 19
 The sovereignty and jurisdiction of the states was recognized in Smith v. Maryland, 59 U.S. (18 How.) 71, 15 L.Ed. 269 (1855), where a Maryland statute regulating the harvesting of oysters in its waters was challenged on the grounds that it was repugnant to the commerce clause of the Constitution and conflicted with the admiralty jurisdiction of the United States. In upholding the statute, the Court noted that "(w)hatever soil below low-water mark is the subject of exclusive propriety and ownership, belongs to the State on whose maritime border, and within whose territory it lies, subject to any lawful grants of that soil by the State, * * *." Id., at 74. On the question of admiralty jurisdiction the Court said:
 
 
 20
 "But we consider it to have been settled by this court, in United States v. Bevans, 3 Wheat (336) 386, (4 L.Ed. 404), that this clause in the constitution did not affect the jurisdiction, nor the legislative power of the States, over so much of their territory as lies below high-water mark, save that they parted with the power so to legislate as to conflict with the admiralty jurisdiction or laws of the United States. As this law conflicts neither with the admiralty jurisdiction of any court of the United States conferred by congress, nor with any law of congress whatever, we are of opinion it is not repugnant to this clause of the constitution." Id., at 76.
 
 
 21
 Some years later in McCready v. Virginia, 94 U.S. (IV Otto) 391, 24 L.Ed. 248 (1876), the Court had occasion to consider the authority of Virginia to regulate oyster cultivation in its tidal rivers, and the purely local nature of such cultivation was stated as follows:
 
 
 22
 "The planting of oysters in the soil covered by water owned in common by the people of the State is not different in principle from that of planting corn upon dry land held in the same way. Both are for the purposes of cultivation and profit; and if the State, in the regulation of its public domain, can grant to its own citizens the exclusive use of dry lands, we see no reason why it may not do the same thing in respect to such as are covered by water." Id., at 396.
 
 
 23
 Concluding that the Virginia legislation did not violate the commerce clause the Court observed that "(t)here is here no question of transportation or exchange of commodities, but only of cultivation and production. Commerce has nothing to do with land while producing, but only with the product after it has become the subject of trade." Id., at 396.
 
 
 24
 In the light of these authorities, we think it is clear that the cultivation of oysters by the plaintiffs under leases from the State of Virginia is a purely local activity subject to the laws and jurisdiction of the state,[3] and that the City's negligent intrusion upon the plaintiffs' oyster beds was not a maritime tort. Our holding is, of course, a narrow one for we recognize that many activities incident to the harvesting of oysters may properly be the subject of admiralty. Concededly, a collision involving an oyster boat or injury to a crewman on board such a vessel is as "traditionally maritime" as any other commercial activity involving the use and operation of vessels on navigable waters. However, damage to the plaintiffs' leaseholds from sewage discharges is not, in our opinion, related to the maritime aspects of the oystering industry.
 
 
 25
 The judgment of the district court is affirmed.
 
 
 26
 AFFIRMED.
 
 
 27
 Judge Winter and Judge Butzner dissent for the reasons stated by Judge Thomsen in the majority opinion for the panel that initially heard this case, Moore v. Hampton Roads Sanitation Commission, 557 F.2d 1030 (4th Cir. 1976).
 
 
 
 *
 Sitting by designation
 
 
 [1]
 The City and the Commission have cross-appealed from an interlocutory order denying their motions to dismiss the action, in order to preserve their contention that they had an unqualified right to discharge sewage into the Warwick River
 
 
 [2]
 The Health Commissioner acted under the provisions of Va.Ann.Code, 1973 Repl.Vol., § 28.1-175 et seq
 
 
 [3]
 The court noted that there had been no evidence that the Commission had been guilty of any negligence or that its plant had overflowed or functioned improperly. The plaintiffs conceded these points but contended that the buffer zone which had been established around the area of the plant's outfall constituted an unconstitutional taking of their property without compensation. Observing that the Commission in exercise of its power of eminent domain had paid for that part of the river bottom which was physically used for its outfall line, and that the buffer zone had been established by the State Health Commissioner under the authority of § 28.1-175 et seq., of the Virginia Code, the court held that the closure was an appropriate exercise of the State's police power and did not constitute a taking of the plaintiffs' property by the Commission
 
 
 [4]
 In considering the post-verdict motion, the court referred to the evidence that certain pumping stations in the sewage collection lines operated by the City had permitted raw sewage to overflow during the period 1970-72. While these pumping stations were located some four to five miles from the oyster beds which were closed in 1972, the court properly concluded that there was evidence from which the jury could find that these overflows were the source of the high coliform count which resulted in the closure
 
 
 [5]
 The City argues that occasional discharges are permitted by Va.Ann.Code, 1973 Repl.Vol., § 62.1-44.4(2), which requires the maintenance of high water quality only "where physically and economically feasible". Section 44.4(2) applies only to water whose quality is "better than the established standards as of the date on which such standards become effective * * * ". Although the precise standards set for the Warwick River by the State Water Control Board are not in the record, the Board is required to adopt standards consistent with the general policy of that statute, which protects aquatic life, inter alia, from the detrimental effects of pollution. Va.Ann.Code, § 62.1-44.5(2). The water quality of the Warwick has not been shown to be above any legitimate standards set by the Water Control Board; therefore, Virginia law prohibits such "occasional" discharges of raw sewage as the City caused in this case
 
 
 [6]
 The closing of the beds was ordered by the State Health Commissioner, acting under the police power of the Commonwealth. Defendant Hampton Roads Sanitary Commission had no authority to order such closure
 
 
 [7]
 The Submerged Lands Act, 43 U.S.C. 1301 et seq., recognized in § 1311(a) the right of the several states to manage, administer, lease, develop and use lands beneath the navigable waters within the boundaries of each state in accordance with applicable State law, but provided in § 1311(d) that nothing in the Act should affect the control by or under the constitutional authority of the United States of said lands and waters for the purposes of navigation
 
 
 [8]
 In the following cases admiralty courts have refused to apply state notice statutes in a variety of situations: Raymond International v. M/T Dalzellegle, 336 F.Supp. 679 (S.D.N.Y.1971); Fematt v. Los Angeles, 196 F.Supp. 89 (S.D.Cal.1961); Morales v. Galveston, 181 F.Supp. 202 (S.D.Tex.1959), aff'd on other grounds, 370 U.S. 165, 82 S.Ct. 1226, 8 L.Ed.2d 412 (1962); The West Point, 71 F.Supp. 206 (E.D.Va.1947); Frame v. New York, 34 F.Supp. 194 (S.D.N.Y.1940)
 
 
 [9]
 43 U.S.C. § 1311(a) reads in pertinent part as follows:
 "(a) It is determined and declared to be in the public interest that (1) title to and ownership of the lands beneath navigable waters within the boundaries of the respective States, and the natural resources within such lands and waters, and (2) the right and power to manage, administer, lease, develop, and use the said lands and natural resources all in accordance with applicable State law be, * * * vested in and assigned to the respective States."
 Oysters are included within the term "natural resources" as defined in the Act. 43 U.S.C. § 1301(e).
 
 
 [10]
 43 U.S.C. § 1311(d)
 
 
 [11]
 The cases cited by the majority in support of its position on this point are not entirely apposite since each of them involved oil spills and liability was premised upon specific federal legislation, e. g., Rivers and Harbors Act of 1899, 33 U.S.C. § 407; Water Quality Improvement Act, 33 U.S.C. § 1161(b) (2); and Outer Continental Shelf Lands Act, 43 U.S.C. § 1331, et seq
 
 
 *
 Although Judge Craven died before preparation of this opinion, he had voted to reverse the district court and had expressed his approval of the majority panel decision
 
 
 [1]
 Section 8-653 was amended in 1973 but the plaintiffs' claims are governed by the statute as it stood prior to the amendment
 
 
 [2]
 Moore v. Hampton Roads Sanitation Commission, (4 Cir., 1976), 557 F.2d 1030
 
 
 [3]
 The authority of the states over shellfish cultivation was explicitly recognized by the Congress in the Submerged Lands Act of 1943, 43 U.S.C. § 1301, et seq
 43 U.S.C. § 1311(a) reads in pertinent part as follows:
 "(a) It is determined and declared to be in the public interest that (1) title to and ownership of the lands beneath navigable waters within the boundaries of the respective States, and the natural resources within such lands and waters, and (2) the right and power to manage, administer, lease, develop, and use the said lands and natural resources all in accordance with applicable State law be, * * * vested in and assigned to the respective States * * * ."
 Oysters are included within the term "natural resources" as defined in the Act. 43 U.S.C. § 1301(e).